UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| SOUTH CANAAN CELLULAR INVESTMENTS, INC. & | : | |
| SOUTH CANAAN CELLULAR EQUITY, LLC | : | |
| | : | Bankruptcy No. 09-10473 |
| Debtors | : | (Jointly Administered with 09-10474) |

.................................................

MEMORANDUM

.................................................

Lackawaxen Telecom, Inc. ("LTI") has filed a motion to dismiss the two

above-captioned jointly administered chapter 11 cases pursuant to 11 U.S.C. §§ 305(a),

1112(b). It contends that these bankruptcy cases were filed in bad faith and that the

debtors have no prospect of reorganizing. LTI also maintains that these cases are simply

two party state law disputes that should be determined by the Colorado state court

system.[1]

The debtors oppose dismissal. They argue that these bankruptcy cases were

filed in good faith as intending to preserve or enhance the value of the debtors' assets:

their interest in a wireless communications provider operating in Pennsylvania's Pike and

Wayne counties. Furthermore, the debtors assert that they will be able to reorganize by

fixing the allowed claim held by LTI and repaying that allowed claim through

---

[1]In its posthearing submissions, LTI alternatively argues that, if not dismissed, the
debtors' chapter 11 cases should be converted to ones under chapter 7.

distributions made to them as partners of the wireless communications provider or via refinancing or the proceeds from a sale.

Upon consideration of the parties' posthearing submissions, this motion is ripe for adjudication.[2]

## I.

An evidentiary hearing was held and the following facts (many of which were not contested) were proven.

Non-debtor South Canaan Cellular Communications Co., LP, d/b/a Cellular One of Northeast Pennsylvania (referred to by the parties as "SCCCC") is a limited partnership, providing wireless communications services in Pike and Wayne Counties, Pennsylvania, known as Pennsylvania Rural Service Area Five. Exs. D-2, at 6; D-4 (General Information). SCCCC had about 7,900 subscribers in 2008, whose payments generated about 16.5% of company revenue in 2008. The remainder of the annual revenue, 83.5%, was derived from roaming charges. Ex. D-4 (Company Overview). Those roaming charges were paid to a large extent from customers of Verizon Wireless. Id.

The agreement with Verizon Wireless to pay SCCCC roaming charges is due to expire in June 2009. It will renew automatically on an annual basis, id. (Company Overview, General) unless 60 day notice of cancellation is provided, and no such

---

[2]Given the posthearing briefing schedule proposed by the parties, it was expressly agreed at the hearing that the time constraints for adjudication found in section 1112(b)(3) are inapplicable.

2

cancellation notice had been sent as of the date of the hearing on these motions.  Ms.

Carolyn Copp, president of SCCCC, does not anticipate any such cancellation by Verizon

Wireless.  This testimony is credible given that SCCCC "has the best signal coverage in

[its] market, followed by Nextel, then AT&T Wireless."  Id. (Market Overview,

Competition).  If Verizon Wireless cancelled its contract with SCCCC, it might need to

build its own infrastructure in Pennsylvania Rural Service Area Five.  Id. (Company

Overview, General).

      SCCCC has 25 employees.  Id. (Company Overview, General).  Its

(unaudited) revenues have increased from $3,587,183 in 2003 to $14,357,281 in 2008.

Id. (Table 4).  Over that same period, gross profit has improved from $2,177,336 to

$10,884,583.  Id.  And net income has grown from negative $27,649 to positive

$5,995,204.  Id.  SCCCC is constructing new tower sites in its service area and is

planning to provide customers with high speed wireless service via Evolution-Data

Optimized (EDVO).

      SCCCC engaged an expert appraiser, who estimated the fair market value

of SCCCC, sold as a going-concern, at $50,000,000 as of February 20, 2009.  Ex. D-4

(Final Enterprise Value Conclusion).  This valuation assumes adequate opportunity to

market, sell and meet all FCC transfer requirements, a process estimated to take less than

one year.  As of December 31, 2008, SCCC also reported almost $6 million in cash and

about $2 million in receivables.  Ex. D-3.

      As a limited partnership, SCCCC has three limited partners and one general

partner.  SCCTC holds a 49% partnership interest and is not affiliated with LTI, the

debtors or SCTC.  South Canaan Telephone Co. (SCTC) holds a 10.2% interest.  South

3

Canaan Cellular Equity, LLC (SCCE), one of the two chapter 11 debtors in this jointly administered case, holds a $39.8% interest.  Finally, South Canaan  Investments, LLC (SCCI), the other chapter 11 debtor, is the general partner of SCCCC and holds a 1% interest.  Ex. M-1.  The shareholders of SCTC are members of the LLC debtors: SCCI and SCCE.

Debtor SCCI was formed for the purpose of acting as the general partner of SCCCC and its only asset is its 1% interest in that partnership.  It has no employees or operating income.  It sole income is derived from distributions from SCCCC.  Similarly, debtor SCCE has no employees or operating income.  Its sole source of income comes from potential partnership distributions.  There have been no distributions from SCCCC to the debtors or other limited partners since 2002.

Ms. Carolyn Copp serves as chairman, president, equity holder and board member of debtor SCCE, chairman, president, equity holder and sole board member of debtor SCCI, as well as board chairman and shareholder of non-debtor SCTC.  Debtors SCCE and SCCI, along with non-debtor SCTC, control 51% of the partnership interests in SCCCC, LP.  Given such control, Ms. Copp has been actively involved in the operations of SCCCC for a number of years and gives herself credit for the improved financial performance mentioned above.

She and members of her family own a 24% interest in the two debtors, and a similar interest in SCTC.  The offices of the two debtors are located in Ms. Copp's home in West Chester, Pennsylvania. The members of the two LLC debtors are comprised of four families: Edwards, Coughlin, Miller, and Copp.

4

In October 2000, debtors SCCI and SCCE entered into loan agreements with, and signed a $7.5 million promissory note in favor of, CoBank, ACB.  Ex. M-4 (exs. A-C).  At the same time the debtors signed security agreements and agreements pledging to CoBank their interests in the limited partnership SCCCC as additional security.  Ex. M-4 (exs. D-G).  Moreover, the non-debtor SCTC also provided CoBank with a pledge of its partnership interest.  Ex. M-4 (ex. H).  These CoBank loan funds were used by the debtors to acquire their interests in SCCCC, and were used by SCCCC to improve its wireless infrastructure and operations.

The CoBank loan agreements, see exs. M-4(A), ¶¶ 13, 19; M-4(F), §§ 9(H), 10,  provided that Colorado law would govern any disputes involving these agreements. Furthermore, the borrowers and pledgors consented to personal jurisdiction in Colorado state or federal court, at the lender's option.  The lender also had the right to commence litigation in any other forum of competent jurisdiction under these contractual "consent to jurisdiction" provisions.

Under section 4 of these pledge agreements, ex. M-4 (exs. F-H), the three pledging limited partners retained the right to vote their partnership interests and receive distributions so long as there was no default under the loan agreements.  Id.  In the event of default, however, CoBank had the right to assume control of these three partnership interests, "upon two day's prior written notice."  Id.

The debtors acknowledge that they fell into loan default in May 2003, see exs. M-7; M-11, and negotiations to resolve that default took place with CoBank over a number of years.  Those negotiations never yielded any resolution nor settlement; and in October 2007, CoBank assigned for less than face value its loan, security and pledge

5

interests to LTI: an entity controlled by Mr. Frank Coughlin, its president, who controls about a 30% interest in the two debtors and SCTC.  LTI is a Delaware corporation with its principal place of business in Rowland, Pennsylvania.  Ex. M-15, ¶ 2.

Negotiations between the debtors and LTI regarding repayment of the assigned loan obligation ensued, see exs. M-6 to M-10, but were also unsuccessful.  On January 23, 2009, LTI sent written notice "that all rights of the LLC's and SCTC to exercise their respective voting, consensual and other powers of ownership pertaining to the 1% general partnership interest of SCCI and the 50% limited partnership interests of the SCCE and SCTC in South Canaan Cellular Communications Company, L.P. ("SCCCC") shall become vested in LTI two days after the date of this notice. . . ."  Ex. M-5.  This letter further informed of LTI's intent to "commence[] litigation in Colorado to confirm our right to take this action in the event it may be opposed."  Id.

LTI indeed brought suit against the debtors and SCTC in Colorado state court on or about January 23, 2009.  Ex. M-15.  It demanded damages against the debtors for breach of contract in the principal amount of approximately $7.1 million plus "accrued interest, costs and attorneys' fees. . . ."  Id., ¶55.  It also sought against the three pledging limited partners a declaratory judgment that LTI was entitled to exercise their 51% voting rights and other ownership rights in SCCCC.  Id., "Wherefore" clause.

Mr. Coughlin, who has prior experience with cellular networks, believes that SCCCC's revenue dependence on roaming fees from Verizon Wireless places the partnership and its partners at undue risk.  He seeks to replace Ms. Copp as president of the general partner, SCCI, and may seek to sell SCCCC as a going concern.  Ms. Copp, in turn, has no confidence in Mr. Coughlin's managerial skills and fears that the operations

6

of SCCCC would be hindered by his assuming control, to the detriment of the limited

partners and the creditors of those limited partners.  Mr. Coughlin, in rebuttal, questions

Ms. Copp's judgment in permitting SCCCC to retain millions of dollars without making

distributions to its limited partners.

   On January 25, 2009—just prior to the expiration of the 48 hour notice

period—the two debtors filed voluntary petitions in bankruptcy under chapter 11.  These

filings were intended to prevent the loss of the debtors' voting rights in SCCCC by

staying the Colorado litigation.  It also had the effect of enjoining the fixing of LTI's

secured claim by the state court.

   The debtors' bankruptcy schedules reveal that SCCI and SCCE held a joint

interest in a checking account with a balance less than $2,800 and a joint interest in a

CoBank certificate valued at approximately $35,000.  Exs. M-2, M-3 (exs. C, schedules

B). Those interests, plus the debtors' partnership interests in SCCCC, are their only

assets.

   Insofar as creditors are concerned, the two debtors both disclose LTI as

their sole secured creditor, with a disputed claim in the amount of $9.8 million.  They

both list three unsecured creditors: SCCCC and SCTC, and the Bauknight accounting

firm.  SCCI discloses these undisputed obligations as $2,000 owed to Bauknight, $22,500

owed to SCCCC, and about $8,600 owed to SCTC.  SCCE lists those three creditors as

owed $1,075, $22,500 and about $350,000 respectively.  Exs. M-2, M-3 (exs. C,

schedules F).[3]  In addition, the Commonwealth of Pennsylvania Department of Revenue

---

   [3]Bauknight filed unsecured proofs of claim asserting that SCCE owed it $625 and
SCCI owed it $2,450.  See claims dockets, #2.

has filed a proof of claim asserting a priority claim against each debtor in the amount of

$651 and an unsecured claim in the amount of $40.  See Claims dockets, #1.  SCCCC

may have also loaned the debtors funds to retain their bankruptcy counsel.

At the time of the hearing on LTI's dismissal motion, the debtors had not

yet filed a proposed chapter 11 plan.  Ms. Copp testified that any such plan would be

funded by distributions to the debtors from SCCCC, and would pay all allowed claims

over the life of the plan.  She was also considering the future sale of SCCCC, which

would allow for a lump sum payment to LTI.  The debtors also intend to litigate in this

forum the amount of their secured obligation to LTI.

Toward that end, at the time of the hearing on the instant dismissal motion,

the debtors had removed LTI's Colorado state court litigation to the Colorado district

court pursuant to 28 U.S.C. § 1452(a).  They then sought to transfer venue to this district

under 28 U.S.C. § 1412.  LTI opposed removal and transfer by virtue of section 1452(b).

After the hearing on the instant dismissal motion was concluded, LTI filed a

memorandum attaching a copy of an order from the District Court for the District of

Colorado, dated April 1, 2009.  In this order, the district court remanded to Colorado state

court LTI's claims against non-debtor SCTC.  The district court then added:

> If LTI is successful in dismissing the bankruptcy petitions,
> then the [bankruptcy] stay will be lifted and the claims against
> Borrowers may also proceed in state court. If not, then LTI
> has the inconvenience of litigating its claims against the
> [debtors] in bankruptcy court and its claims against SCTC in
> Colorado state court.

April 1, 2009 Order, at 5.

The district court's reference to the bankruptcy stay recognizes that LTI's

civil action against the debtors, but not against SCTC ,was enjoined by section 362(a).

8

See, e.g., Maritime Electric Co., Inc. v. United Jersey Bank, 959 F.2d 1194 (3d Cir. 1991)

(bankruptcy stay found in section 362(a) applies to all litigation against the debtor but not

against non-debtors).  Therefore, if LTI prevails in the Colorado litigation against SCTC,

Mr. Coughlin, through LTI, will control SCTC's 10.2% interest in SCCCC.  If these

bankruptcy cases are not dismissed, Ms. Copp, through the debtors, will remain in control

of a combined 40.8% interest in SCCCC as well as control the general partner.  Non-

debtor and unaligned SCCTC, of which little was revealed during the hearings, may hold

the balance of power through its 49% partnership interest.

       The facts just summarized are not seriously challenged except in two

regards.  First, as noted, the amount currently owed to LTI as assignee of CoBank is

contested.  The debtors suggest that their challenge is based upon Mr. Coughlin's

connection with the debtors and information he may have obtained prior to LTI's

assignment transaction with CoBank, as well as a contention that CoBank agreed to waive

certain contractual rights.  That factual dispute need not be resolved to determine this

contested matter.

       The second dispute, as will be discussed, is more material.  LTI argues that

it would be in the interest of the debtors, SCCCC, LTI and the other limited partners to

replace Ms. Copp the individual in charge of the wireless communications company.  Ms.

Copp contends that SCCCC has become valuable and profitable due to her controlling

efforts, and Mr. Coughlin's control would jeopardize its value.  For reasons to be

discussed below, the limited evidence offered does not persuade me that a transfer of

control via dismissal of these bankruptcy cases is in the best interest of all concerned.[4]


II.


A.


On request of a party in interest, a court may dismiss a chapter 11 case or

convert it to chapter 7, "whichever is in the best interest of creditors and the estate, if the

movant establishes cause." 11 U.S.C. § 1112(b)(1). While subsection (b)(4) provides

some specific examples of circumstances in which cause may arise, those examples are

not exclusive. The Third Circuit Court of Appeals has held that implicit in section

1112(b)(1) is the requirement that every chapter 11 bankruptcy case be filed in good faith.

See, e.g., In re Integrated Telecom Express, Inc., 384 F.3d 108, 118 (3d Cir. 2004), cert.

denied, 545 U.S. 1110 (2005); In re SGL Carbon Corp., 200 F.3d 154, 160 (3d Cir. 1999);

see also In re Brown, 951 F.2d 564, 567 (3d Cir. 1991); Carolin Corp. v. Miller, 886 F.2d

693, 698 (4th Cir. 1989); In re Chisum, 847 F.2d 597, 600 (9th Cir. 1988); Argus Group

1700, Inc. v. Steinman, 206 B.R. 757 (E.D. Pa. 1997); In re SB Properties, Inc., 185 B.R.

---

[4]This is not to imply, however, that SCCTC may not have information that leads it
to a reach a different conclusion.

198 (E.D. Pa. 1995).[5]  Therefore, if a petition is filed in bad faith, it may be dismissed for

cause under section 1112(b)(1).  See, e.g., In re Integrated Telecom Express, Inc., 384

F.3d at 118;  In re SGL Carbon Corp, 200 F.3d at 162; Carolin Corp. v. Miller; In re

Natural Land Corp., 825 F.2d 296 (11th Cir. 1987).

   The Third Circuit Court of Appeals also has instructed that "[a]t its most

fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful

balancing of interests is not undermined by petitioners whose aims are antithetical to the

basic purposes of bankruptcy."  In re Integrated Telecom Express, Inc., 384 F.3d at 119.

In the Third Circuit, "[o]nce at issue, the burden falls upon the bankruptcy petitioner to

establish that the petition has been filed in 'good faith.'"  In re SGL Carbon Corp., 200

F.3d at 162 n.10.  Accordingly, once the movant meets an initial burden of production,

see In re Capitol Food Corp. of Fields Corner, 490 F.3d 21, 24 (1st Cir. 2007), the debtor

bears the ultimate burden of persuasion on the issue of bad faith.

--------

[5]In re Capitol Food Corp. of Fields Corner, 490 F.3d 21 (1st Cir. 2007), the
First Circuit observed that "the Bankruptcy Abuse Prevention and Consumer Protection Act,
Pub. L. 109-8, 119 Stat. 23 (2005), recently included in the Code an explicit 'good faith'
definition in § 362(c)(3)(B), (C) (provisions to discourage multiple bankruptcy filings by same
debtor within one-year period), but did not so amend § 1112(b)."  Id., at 24 n.1.  Moreover, the
same 2005 statute (known as BAPCPA) provided an express requirement for good faith filing in
chapter 13 cases in section 1325(a)(7), but did not provide a companion provision in chapter 11.
  In Capitol Food Corp., the First Circuit assumed arguendo that Congress did not
intend in amending the Bankruptcy Code in 2005 to overrule or alter decisions such as In re
Integrated Telecom Express, Inc. holding that a chapter 11 case filed in bad faith can be
dismissed under section 1112(b).  The LLC debtors here do not contend that BAPCPA has
overruled Third Circuit decisions finding an implicit good faith requirement in section 1112(b).
  Although I can find no written decision from the Third Court addressing the
question of good faith in a chapter 11 bankruptcy case governed by BAPCPA, (Perlin v. Hitachi
Capital America Corp., 497 F.3d 364, 368 (3d Cir. 2007) was governed by BAPCPA but
concerned a chapter 7 filing and section 707), given the reasoning underlying its decisions
finding an implicit good faith requirement for all bankruptcy filings, I consider it highly unlikely
that the provisions of BAPCPA would cause the Court of Appeals to now hold otherwise for
chapter 11 cases.

For example, a chapter 11 case is filed in bad faith when there is no possibility that the debtor can reorganize under chapter 11.  See Carolin Corp. v. Miller; see also Matter of Love, 957 F.2d 1350 (7th Cir. 1992); Matter of Cohoes Indus. Terminal, Inc., 931 F.2d 222.  In such an instance, the bankruptcy filing merely serves to delay creditors without increasing the value of the estate or preserving any going concern. Moreover, a number of decisions hold that bad faith is present when the debtor is using the bankruptcy filing "merely to obtain tactical litigation advantages."  In re SGL Carbon Corp., 200 F.3d at 165; see, e.g., In re 15375 Memorial Corp., 2009 WL 187570, at *4 (D. Del. 2009); In re C-TC 9th Avenue Partnership, 193 B.R. 650, 654 (Bankr. N.D.N.Y. 1995) ("Where the primary purpose of the filing of a Chapter 11 case is as a litigation tactic, the petition may be dismissed for lack of good faith").

Thus, in In re Argus Group 1700, Inc., 206 B.R. 737, 753 (Bankr. E.D. Pa. 1996), the court noted that, in general, a bankruptcy reorganization case may properly be dismissed as in bad faith "where the bankruptcy petition was filed as a litigation tactic, a forum shopping device and/or to resolve what is essentially a two-party dispute."  Cf. In re Mazzocone, 200 B.R. 568, 576 (E.D. Pa. 1996) (suspension of a bankruptcy case under section 305 was warranted "if the bankruptcy forum is indeed being used as a forum to resolve what is in essence a two-party dispute.").

Whether any bankruptcy case is filed in bad faith depends upon the totality of the circumstances.  See, e.g., Perlin v. Hitachi Capital America Corp., 497 F.3d 364, 372 (3d Cir. 2007)  In re SGL Carbon Corp., 200 F.3d at 162; In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996); see, e.g., Matter of Cohoes Indus. Terminal, Inc., 931 F.2d 222, 227 (2d Cir. 1991); In re Ravick Corp., 106 B.R. 834, 843 (Bankr. D.N.J. 1989).  Although

the totality of the circumstances approach is not constrained to any particular fact pattern, the Third Circuit has generally instructed: "Our cases have accordingly focused on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." In re Integrated Telecom Express, Inc., 384 F.3d at 119-20; see In re SGL Carbon Corp., 200 F.3d at 165; see generally Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Partnership, 526 U.S. 434, 453 (1999).

Accordingly, a bad faith chapter 11 filing may occur when a bankruptcy petition is filed simply to create a bankruptcy forum for a two-party dispute based upon non-bankruptcy law, and no reorganization purpose is intended. Similarly, a chapter 11 petition may be in bad faith if a particular outcome of the two-party dispute, involving state court claims and implicating pre-existing state court litigation, is necessary for any chapter 11 reorganization to occur. See also In re SB Properties, Inc., 185 B.R. at 205; In re Fonke, 310 B.R. 809, 817 (Bankr. S.D. Tex. 2004); In re Herndon, 218 B.R. 821, 825 (Bankr. E.D. Va. 1998); see generally In re Stingfree Technologies Co., No. 08-16232, slip op. at 39-40 (Bankr. E.D. Pa., Feb. 4, 2009) (dismissal under section 1112(b) is warranted when chapter 11 reorganization cannot be obtained unless the debtor prevails on a claim subject to mandatory arbitration).

Various courts and commentators have identified the following non-exclusive indicia reflecting the possibility of bad faith chapter 11 bankruptcy filing:

> (1) the debtor has few or no unsecured creditors;
> (2) there has been a previous bankruptcy petition by the debtor or a related entity;
> (3) the prepetition conduct of the debtor has been improper;

13

(4) the petition effectively allows the debtor to evade court orders;
(5) there are few debts to non-moving creditors;
(6) the petition was filed on the eve of foreclosure;
(7) the foreclosed property is the sole or major asset of the debtor;
(8) the debtor has no ongoing business or employees;
(9) there is no possibility of reorganization;
(10) the debtor's income is not sufficient to operate;
(11) there was no pressure from non-moving creditors;
(12) reorganization essentially involves the resolution of a two-party dispute;
(13) a corporate debtor was formed and received title to its major assets immediately before the petition; and
(14) the debtor filed solely to create the automatic stay.

In re SB Properties, Inc., 185 B.R. at 205 (footnotes omitted) (quoting Mellon Bank v. Selig (In re Selig), 1993 WL 764800, at *3 (Bankr. M.D. Pa., July 8, 1993)); see generally In re Cornelius, 195 B.R. 831 (Bankr. N.D.N.Y. 1995); 5 Norton Bankruptcy Law & Practice 3d, § 103:23 (2009).

Of course, the existence of one or more such indicia does not compel a finding that the debtor filed its bankruptcy petition in bad faith.  Instead, a court must consider all of the relevant circumstances surrounding the filing, giving due regard to the congressional purposes behind chapter 11.  Accordingly, even if a chapter 11 debtor is not operating and so has no employees, its bankruptcy petition may be in good faith if it is designed to maximize the value of its assets for creditors and equity security interests. See, e.g., In re American Capital Equipment, LLC, 2008 WL 4597221, at *3 (3d Cir. 2008) (non-precedential); In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 201 (3d Cir. 2003) (debtor's sole asset was a valuable stock certificate and had but one employee).

At bottom, the issue of dismissal under section 1112(b)(1) is committed to bankruptcy court discretion.  See In re American Capital Equipment, LLC, 2008 WL

14

4597221, at *2; <u>Perlin v. Hitachi Capital America Corp.</u>, 497 F.3d at 373.  Moreover, a

finding that a bankruptcy petition was not filed in good faith "'should not [be] lightly

infer[red].'"  <u>Perlin v. Hitachi Capital America Corp.</u>, 497 F.3d at 373 (quoting <u>In re</u>

<u>Tamecki</u>, 229 F.3d 205, 208 (3d Cir. 2000)); <u>cf.</u> <u>In re Brown</u>, 951 F.2d 564, 572 (3d Cir.

1991) ("[W]e think that the evidence, then existing, of bad faith was not strong enough to

enable us to say that it was established as a matter of law.").[6]


B.


In addition to section 1112, under 11 U.S.C. § 305(a)(1) a bankruptcy court

"may dismiss a case under this title, or may suspend all proceedings in a case under this

title, at any time if—(1) the interest of creditors and the debtor would be better served by

such dismissal or suspension."

The legislative history behind the enactment of section 305 explains its

purpose:

> A principle of the common law requires a court with
> jurisdiction over a particular matter to take jurisdiction.  This
> section recognizes that there are cases in which it would be
> appropriate for the court to decline jurisdiction.  Abstention

---

[6]Although the Third Circuit instructs that a debtor's burden to establish good faith in filing a bankruptcy petition is not a heavy one, the Court of Appeals appears not to have adopted the Fourth Circuit's light standard as set forth in <u>Carolin Corp. v. Miller</u>, 886 F.2d 693, 701 (4th Cir. 1989):

> [I]t is better to risk proceeding with a wrongly motivated
> invocation of Chapter 11 protections whose futility is not
> immediately manifest than to risk cutting off even a remote chance
> that a reorganization effort so motivated might nevertheless yield a
> successful rehabilitation.

15

under this section, however, is of jurisdiction over the entire case. Abstention from jurisdiction over a particular proceeding in a case is governed by proposed 28 U.S.C. 1471(c). Thus, the court is permitted, if the interests of creditors and the debtor would be better served by dismissal of the case or suspension of all proceedings in the case, to so order. The court may dismiss or suspend under the first paragraph [section 305(a)], for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the results of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case. . . .

Sen. Rep. No. 95-989, 95th Cong. 2d Sess., at 35-36 (1978).

Whether to dismiss a case or abstain pursuant to section 305 is committed to the discretion of the bankruptcy court, and is also determined based upon the totality of the circumstances. See, e.g., In re Macke Int'l Trade, Inc., 370 B.R. 236, 247 (B.A.P. 9th Cir. 2007); see generally In re Argus Group 1700, Inc., 206 B.R. 737, 755 (Bankr. E.D. Pa. 1996). Application of section 305 is an extraordinary remedy. In re Mazzocone, 200 B.R. 568, 575 (E.D. Pa. 1996); In re Fortran Printing, Inc., 297 B.R. 89, 94 (Bankr. N.D. Ohio 2003). A court will only abstain or dismiss a case if it is in the best interest of the creditors as well as the debtor. See In re Pennino, 299 B.R. 536, 538-39 (B.A.P. 8th Cir. 2003); In re Mazzocone, 200 B.R. at 575. The evidentiary burden is upon the party seeking dismissal or abstention under section 305(a). See In re R & A Business Associates, Inc., 1999 Bankr. Lexis 543, at *51 (Bankr. E.D. Pa.), aff'd, 1999 WL 820859 (E.D. Pa. Oct. 14, 1999); In re Corino, 191 B.R. 283, 287 (Bankr. N.D.N.Y. 1995); In re Martin-Trigona, 35 B.R. 596, 600 (Bankr. S.D.N.Y. 1983).

Some of the non-exclusive factors commonly considered when a motion under section 305(a) is determined are:

16

> (1) economy and efficiency of administration; (2) whether
> another forum is available to protect the interests of both
> parties or there is already a pending proceeding in a state
> court; (3) whether federal proceedings are necessary to reach
> a just and equitable solution; (4) whether there is an
> alternative means of achieving the equitable distribution of
> assets; (5) whether the debtor and the creditors are able to
> work out a less expensive out-of-court arrangement which
> better serves all interests in the case; (6) whether a
> non-federal insolvency has proceeded so far in those
> proceedings that it would be costly and time consuming to
> start afresh with the federal bankruptcy process; and (7) the
> purpose for which bankruptcy jurisdiction has been sought.

In re R & A Bus. Assoc., Inc., 1999 Bankr. LEXIS 543, at *53-*54; see also In re

Mazzocone, 200 B.R. at 575; In re Greene, 1999 WL 761091, at *4 (E.D. Pa. 1999).

Courts have applied this provision after concluding that there is pending

litigation in a non-bankruptcy forum that can adjudicate the respective interests of all

parties fairly and economically.  As noted in In re Macke Intern. Trade, Inc., 370 B.R. at

247:

> Typical circumstances for dismissing under § 305(a)(1)
> include the pendency of proceedings such as assignments for
> the benefit of creditors . . . state court receiverships . . . or
> bulk sale agreements. . . .  Another consideration is where
> there are few, if any, valuable nonexempt assets and the
> administrative expenses would likely consume the entire
> estate. . . .

(citations omitted); see also In re 801 South Wells Street Ltd. Partnership, 192 B.R. 718,

724 (Bankr. N.D. Ill. 1996) ("A suitable alternative forum will be deemed to exist if in

that forum 'there are pending arrangements that will equitably satisfy the creditors and

not be unduly burdensome or prejudicial to the debtor,' so that continuation of the

bankruptcy proceeding will be 'duplicitous and uneconomical.'") (quoting In re RAI

Marketing Services, Inc., 20 B.R. 943, 946 (Bankr. D. Kan. 1982)).

17

III.


        In support of dismissal, LTI emphasizes that the debtors are not operating,

have no employees, have nominal assets except for their partnership interests, and have

virtually no non-insider held claims except LTI's.  LTI Reply Memorandum, at 2.  LTI

views the LLC bankruptcy filings as improper attempts "to frustrate LTI's rights to

exercise the voting, consensual and other powers of ownership of the Debtors."  LTI

Memorandum, at 11.  Moreover, LTI maintains that it holds a veto power in these chapter

11 cases, in that the debtors cannot confirm a chapter 11 without LTI's affirmative vote

as required by 11 U.S.C. § 1129(a)(10).  If so, then no bankruptcy reorganization can

occur, as LTI will not vote in favor of any plan proposed by the debtors if its secured

claim is impaired.[7]  LTI Memorandum, at 26.  Accordingly, LTI argues that these LLC

bankruptcy cases were filed in bad faith to delay LTI while Ms. Copp retains control of

the limited partnership, SCCCC, thereby warranting relief under section 1112(b).  LTI

Memorandum, at 17; see generally Matter of Golden Ocala Partnership, 50 B.R. 552, 557

(Bankr. M.D. Fla. 1985) ("It should be noted at the outset that this is not so much an

attempt to effectuate a reorganization by a financially distressed debtor, as it is an attempt

to have this Court furnish a forum to the Debtor to resolve an in-house battle centering

around the ownership and control in a non-debtor corporation which Sheridan voluntarily

gave up.").

_____

        [7]Only impaired classes of claims or interests are entitled to vote on chapter 11
plans.  11 U.S.C. § 1126(f).

18

In addition, LTI asserts that any challenge the debtors are entitled to raise against LTI's secured claim and assertion of ownership rights should be raised in the state court litigation pending at the time of the bankruptcy filing.  LTI represents that it "does not intend to avoid the very judicial process that it set in motion, and LTI will not attempt to commandeer the business, until the state court enters an appropriate order to allow it, peacefully and in orderly fashion, to exercise its contractually bargained for rights."  LTI Memorandum, at 19.  Therefore, it contends that relief under section 305(a)(1) is appropriate.[8]

The debtors counter that Ms. Copp has successfully undertaken a "Herculean job" in transforming SCCCC into a profitable enterprise for the benefit of all of its limited partners and their creditors, including the Coughlin family and LTI.  See Debtors' Memorandum, at 13.  Were LTI to obtain the relief it was seeking in the

---

[8]LTI does not argue that these chapter 11 cases are bad faith attempts by the debtors to circumvent mandatory forum selection clauses that must be enforced in this bankruptcy court.  See generally In re Head, 223 B.R. 648 (Bankr. W.D.N.Y. 1998).  The absence of such a contention from LTI may arise because the contractual "consent to jurisdiction" provisions found in the CoBank Master Loan Agreement and Partnership Interest Pledge Agreements allowed the debtors to be sued in Colorado state or federal courts but did not compel the use of either Colorado forum.  Because CoBank was not obligated to sue the debtors in any Colorado forum, these contractual provisions are "permissive consent-to-jurisdiction provision[s], and not . . . mandatory and exclusive forum selection clause[s]."  See Blanco v. Banco Indus. de Venezuela, S.A., 997 F.2d 974, 979 (2d Cir. 1993).  Alternatively, LTI may have concluded that some if not all of its claims asserted against the debtors in the state court litigation would be classified as core matters under 28 U.S.C. § 157(b).  See In re Exide Technologies, 544 F.3d 196, 218 n.15 (3d Cir. 2008) ("If the claims at issue are non-core, this forum selection clause should be enforced.").

Under Colorado law, enforcement of a forum selection clause can be waived.  See generally Edge Telecom, Inc. v. Sterling Bank, 143 P.3d 1155, 1160 (Colo. App. 2006).  As LTI has not asserted the existence of a mandatory forum selection clause, for the purpose of resolving this contested matter I shall accept the debtors' contention that the disputes between the debtors and LTI can be resolved in this bankruptcy forum.  Compare In re Stingfree Technologies Co., No. 08-16232, slip op. (Bankr. E.D. Pa., Feb. 4, 2009) (ownership dispute over the sole asset must be decided in an arbitration forum).

19

Colorado litigation the result would replace honest, competent management, "which will

harm the value of Debtors' assets," Debtors' Memorandum, at 12, and leave the members

of the debtors and their creditors without any funds.  Debtors' Memorandum, at 10.  "The

motive behind the [bankruptcy] petitions was not simply to retain control of SCCCC but

to preserve the assets of the Debtors for the benefit of creditors and members. . . .  The

Debtors have taken refuge in the bankruptcy court for the very purpose of the system: to

give Debtors a breathing spell from their creditors and time to attempt a repayment plan."

Debtors' Memorandum, at 14.

Furthermore, the debtors argue: "The bankruptcy system will be used for

the purpose for which it is intended to allow the maximum value of the Debtors' interests

in SCCCC to be realized either through an orderly sale at an appropriate time or a

reorganization plan funded through distributions from SCCCC's operations."  Debtors'

Memorandum, at 10.  Indeed, the debtors view their bankruptcy filings as designed to

allow SCCCC "to continue to operate under the same management that has made SCCCC

so successful in the past three years, thus creating value for both creditors and

shareholders."  Debtors' Memorandum, at 23.

Insofar as a confirmation of a chapter 13 plan is confirmed, the debtors

argue, as just mentioned, that such a plan may call for a sale of SCCCC, with distributions

from the sale proceeds to the limited partners, including the debtors, as the source of plan

funding, or funding of a plan through the continued operations of SCCCC with

distributions of net profits to the debtors.  The debtors also suggest that they may

reorganize via refinancing.  Debtors' Memorandum, at 17.  In any event, the debtors

maintain that any plan they propose will pay all allowed claims in full and also provide

some value for members of the LLC debtors.  Debtors' Memorandum, at 27.

Of course, the debtors acknowledge that unless LTI's claim is unimpaired

within the meaning of section 1124, they will need an impaired class to support their

proposed plans without consideration of the votes of insiders.  11 U.S.C. § 1129(a)(10);

In re PPI Enterprises (U.S.), Inc., 324 F.3d at 202 n.7.  LTI contends that the non-insider

creditors in these cases hold but nominal claims, and thus can be repaid in full on the

effective date of any plan and so would not be impaired.

The debtors respond that "artificial impairment" of claims is permitted,

citing In re Duval Manor Assocs., 191 B.R. 622, 628 (Bankr. E.D. Pa. 1996) ("artificial

impairment, while perhaps not philosophically the better view, is nevertheless clearly

permitted under the plain meaning of the statute").  But see In re River Village

Associates, L.P., 1993 WL 243897, at *4 (Bankr. E.D. Pa. 1993) ("[A]llowing a purely

'artificial impairment' of a class would violate the spirit of John Hancock Mut. Life Ins.

Co. v. Route 37 Business Park Associates, 987 F.2d 154, 158-62 (3d Cir. 1993), if not the

plain language of the Bankruptcy Code.").[9]

At the conclusion of the evidentiary hearing, counsel for the United States

trustee argued that the evidence presented did not support LTI's request for relief.

However, he did assert that creditors of the debtors were entitled to a prompt

reorganization process.

---

[9]In its John Hancock decision, the Third Circuit disapproved of a chapter 11 plan
that "gerrymandered" claims: i.e., "the Code was not meant to allow a debtor complete freedom
to place substantially similar claims in separate classes."

IV.


To a large extent, the present contested matter involves consideration of the appropriate role, if any, that a bankruptcy forum should play in the dispute between Mr. Coughlin (acting through LTI) and Ms. Copp (acting through the debtors), given the totality of the circumstances as summarized above.  Moreover, this question is posed at the outset of the bankruptcy cases in the form of a motion to dismiss.

Ms. Copp believes that SCCCC has become a valuable profitable entity under her management and because of the funds borrowed by the debtors from CoBank. With the breathing spell provided by the Bankruptcy Code, the debtors, as SCCCC's limited partners, argue that they can and will repay LTI in full.  This, Ms. Copp opines, is an appropriate use of this forum.

Mr. Coughlin believes that LTI's contractual rights, as assignee from CoBank, should be enforced in state court.  If LTI should prevail, he suggests that all that would result is that SCCCC will be under new (and improved) management.  As the debtors are without employees, vendors, or significant creditors (aside from LTI), bankruptcy court has no legitimate role to play to supplement that state court forum contractually permitted by the debtors.

In resolving this contested matter, I find the present dispute distinguishable from the facts detailed in In re First Connecticut Consulting Group, Inc., 340 B.R. 210 (D. Vt. 2006).  In that case, chapter 11 cases filed on behalf of limited liability companies were dismissed when the individual authorizing these filings "had no ownership interest in the Debtor LLCs and knew it at the time he caused them to file for Chapter 11

22

protection." Id., 340 B.R. at 222.  Here, the debtors clearly have ownership interests in

SCCCC, which interests LTI seeks to recover.

Nonetheless, I find that LTI has established a number of the indicia courts

consider in determining whether a chapter 11 case was filed in bad faith, and thus has met

its initial evidentiary burden of production.  The question is whether the debtors have met

their burden of persuasion to establish their good faith.

Clearly, these two bankruptcy petitions were not filed to preserve the

debtors' going concern values:

> As the Bankruptcy Court recognized, Integrated is
> unquestionably "out of business," and therefore has no going
> concern value to preserve in Chapter 11 through
> reorganization or liquidation under the Bankruptcy Code.

In re Integrated Telecom Express, Inc., 384 F.3d at 120.

Nevertheless, as just noted, the debtors contend that their filings were

intended to maximize the value of their partnership interests in SCCCC.  That issue was

also considered by the Third Circuit in the context of a chapter 11 liquidation:

> The question therefore becomes whether Integrated's petition
> might reasonably have "maximiz[ed] the value of the
> bankruptcy estate." Toibb, 501 U.S. at 163, 111 S. Ct. 2197 . .
> . .
>
> To say that liquidation under Chapter 11 maximizes the value
> of an entity is to say that there is some value that otherwise
> would be lost outside of bankruptcy.  Elizabeth Warren,
> Bankruptcy Policymaking In an Imperfect World, 92 Mich.
> L.Rev. 336, 350 (1993) ("Two empirically based economic
> assumptions underlie the attempt to preserve the value of a
> failing company: (1) orderly liquidation is likely to produce
> more value-or to avoid more loss-than piecemeal liquidation;
> and (2) going-concern value is likely to be higher than
> liquidation value."); Collier on Bankruptcy ¶ 1108.12
> ("[W]here liquidation is appropriate, the Code contemplates
> orderly liquidation and not a 'fire sale.' ").

23

Id., 384 F.3d at 120-21.

In deciding whether these two chapter 11 petitions are designed to protect

value that would otherwise be lost absent the bankruptcy filings, I find the disputed issue

of managerial competency relevant.  I also find relevant the relief sought by LTI in its

state court litigation.

LTI focuses solely upon its request in the Colorado state court for a

declaratory judgment that it is entitled to exercise the debtors' and SCTC's 51% voting

rights, managerial and other ownership rights in SCCCC.  If it were granted such relief,

and if Mr. Coughlin is at least as capable a manager of SCCCC as Ms. Copp, then LTI's

premise underlying this contested matter is correct: Were the Colorado litigation

permitted to conclude, the LLC debtors would continue to hold their limited partnership

interests and Mr. Coughlin, through LTI, would manage the wireless provider SCCCC for

the benefit of its limited partners.  Given the various facts proven, it would be

inappropriate for a bankruptcy court to stay such a transfer of managerial control for the

benefit of Ms. Copp.

LTI's argument, though, overlooks that its state court litigation also seeks a

monetary judgment against the debtors and SCTC.  The entry of such a judgment could

result in the debtors' loss of their limited partnership interests to the detriment of the

various members of the debtor LLCs.  Bankruptcy petitions can be filed to prevent an

asset loss to a secured creditor, and the chapter 11 filing will be in good faith when

reorganization is possible.  See, e.g., In Re Capitol Food Corp. of Fields Corner,

490 F.3d at 25 (chapter 11 filed in good faith to preserve a "lucrative leasehold"); Matter

of James Wilson Associates, 965 F.2d 160, 170-71 (7th Cir. 1992); Matter of Little Creek

24

Development Co., 779 F.2d 1068, 1073 (5th Cir. 1986) (chapter 11 filing to prevent

foreclosure is not bad faith if the debtor can reorganize) (citing In re Route 202 Corp., 37

B.R. 367, 373 (Bankr. E.D. Pa. 1984)); Matter of Madison Hotel Associates, 749 F.2d

410, 426 (7th Cir. 1984).  Such a filing may preserve value for the debtor and its

creditors.

LTI's argument also overstates the evidence challenging Ms. Copp's

managerial competency.  Clearly, the financial records of SCCCC support the debtors'

position that SCCCC has become more valuable in recent years under her management,

measured by income and profit.  However, as LTI contends, there is a risk to a business

when its income and profit are derived primarily from one customer source, as in this

instance.  But there was no evidence to demonstrate that the income from that one

customer source would be soon terminated, nor that Ms. Copp is opposed to expanding

the source of SCCCC revenues.  Indeed, LTI's complaint about SCCCC retaining profits

in lieu of partner distributions can be viewed as an objection to the reasoned business

judgment of Ms. Copp to have SCCCC improve and expand its infrastructure to increase

the number of customer sources.

Thus, based upon the evidentiary record, I cannot conclude, as LTI would

argue, that dismissal of these bankruptcy cases and the continuation of the Colorado state

court litigation would have no adverse affect upon the operations of SCCCC or the value

of the assets of the debtors.  Insofar as a finding of bad faith should be made upon

sufficient evidence and not "lightly inferred" I would conclude that the debtors have met

their burden of demonstrating good faith on this point.

Nevertheless, dismissal would still be warranted if it were clear at present that the debtors could not confirm a chapter 11 plan absent the affirmative vote of LTI, or that continuation of the Colorado state court litigation would be in the debtors' best interests as well as those of its creditors.  See Matter of Little Creek Development Co., 779 F.2d at 1073 ("Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'").

As to the latter point, given LTI's request for a monetary judgment against the debtors, with the potential for execution upon that judgment that would eliminate the LLCs' partnership interests, continuation of the state court litigation would neither be in the debtors' best interests nor in the interests of its non-LTI creditors.  Moreover, that state court litigation had been filed only two days before these bankruptcy cases stayed any further action.  Therefore, there are no issues of comity or judicial economy to consider.  Furthermore, as both LTI and the debtors are located in Pennsylvania, the Colorado forum is not more convenient to either of them.  See generally In re Cytodyn of New Mexico, Inc., 374 B.R. 733, 738 (Bankr. C.D. Cal. 2007); In re RCM Global Long Term Capital Appreciation Fund, Ltd., 200 B.R. 514, 524-25 (Bankr. S.D.N.Y. 1996).

As to the former point, the debtors' ability to confirm a plan will depend upon whether they can propose to pay LTI its allowed secured claim in full on the plan effective date, and thereby leave its claim unimpaired, or whether artificial impairment is permissible.  If LTI's claim is not impaired, it cannot vote against the debtors' chapter 11

26

plan and so could not veto their reorganization.  See In re PPI Enterprises (U.S.), Inc., 324

F.3d at 202.

The propriety of a chapter 11 plan that artificially impairs a class of

creditors solely to meet the requirement of section 1129(a)(10) has divided courts and

commentators.  See Carragher, Artificial Impairment Revisited, 24 Amer. Bankr. Inst. J.

26 (Feb. 2005).  The Third Circuit has not addressed the issue other than in the context of

a mass tort chapter 11 case.  In re Combustion Engineering, Inc., 391 F.3d 190, 243 (3d

Cir. 2004):

> While there is nothing in either §§ 1129(a)(10) or 1124
> expressly prohibiting a debtor from "artificially impairing"
> the claims of creditors courts have found this practice
> troubling.
>
> In the context of this asbestos-related bankruptcy, so do we.
> Unlike the ordinary commercial bankruptcy, where stub
> claims may be used to facilitate a workout plan in the overall
> best interests of creditors, the use of stub claims in this case
> may constitute "artificial impairment" under § 1129(a)(10).

I decline to reach this issue in the circumstance of the instant dismissal

motion, as it seems advisory.  See generally Coffin v. Malvern Federal Sav. Bank, 90

F.3d 851 (3d Cir. 1996).  The debtors may propose a liquidating chapter 11 plan, or

refinance the LTI obligation, and thereby render that legal issue inapplicable.  From the

evidence presented, I need only conclude that there may be enough value in SCCCC and

the interests of the limited partners to bring forth a buyer (e.g., Verizon Wireless) or to

achieve refinancing.  That being so, I cannot presently hold that the LLC debtors have no

chance of reorganization in chapter 11 and that Ms. Copp's contention to the contrary is

the product of "terminal euphoria."

27

Accordingly, an appropriate order will be entered denying LTI's motion to dismiss these cases.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: May 19, 2009