UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| SOUTH CANAAN CELLULAR INVESTMENTS, INC. & | : | |
| | : | |
| SOUTH CANAAN CELLULAR EQUITY, LLC | : | Bankruptcy No. 09-10473bf |
| Debtors | : | (Jointly Administered with 09-10474bf) |

.................................................

MEMORANDUM OPINION

.................................................

The above-captioned chapter 11 debtors seek confirmation under 11 U.S.C.
§1129(b) of their jointly filed second amended chapter 11 plan dated September 28, 2009.
Confirmation is opposed by secured creditor Lackawaxen Telecom, Inc. ("LTI").
Although LTI raises numerous confirmation objections, its opposition to the debtors'
jointly proposed plan may be summarized thusly: that the only viable chapter 11 plan for
these debtors requires the prompt sale of a limited partnership, in which these debtors are
two of the four limited partners.  LTI contends that the jointly proposed plan does not
assure a prompt sale of the limited partnership sufficient to pay LTI's secured claim in
full, with interest.  The debtors counter that LTI has misconstrued the terms of their
proposed plan and that a prompt sale that will repay LTI in full is indeed the main
component of their plan, and that such a sale shall occur within one year.

Upon review of the evidence presented at the confirmation hearing that took
place over three days, I make the following factual findings.

I.

A.

South Canaan Cellular Communications Co., LP, d/b/a Cellular One of

Northeast Pennsylvania ("SCCCC, LP") is a limited partnership that provides wireless

communications services in Pennsylvania Rural Service Area 5 located in Pike and

Wayne Counties, Pennsylvania.  It holds a cellular B-side FCC license.  1 N.T., at 51.

SCCCC, LP has four limited partners: South Canaan Telephone Co. ("SCTC") holds a

10.2% limited partnership interest; South Canaan Cellular Telephone Co., DE

("SCCTC"), a wholly-owned subsidiary of US Cellular, 1 N.T., at 16, which is in turn a

subsidiary of TDS Telecommunications Corp., 1 N.T., at 6, holds a 49% limited

partnership interest[1]; debtor South Canaan Cellular Equity, LLC ("SCCE") holds a 39.8%

limited partnership interest; and finally debtor South Canaan Cellular Investments, LLC

("SCCI") is the general partner of SCCCC, LP and holds a 1% limited partnership

interest.  See exs. D-5; D-10, at 8-9; 1 N.T., at 50-51.

The limited partnership was reconstituted in October 2000, via a restated

and amended partnership agreement that is governed by the Delaware Revised Uniform

Limited Partnership Act.  Exs. D-2; LTI-1 (tab 3A, 3B).  Among the provisions of the

partnership agreement relevant to this confirmation dispute are: Article 6 (limited

partnership distributions); Article 7 (rights and powers of the partners, including the

---

[1] See also "Response and Reservation of Rights . . ." filed by SCCTC, docket entry
#266.

2

general partner); and Article 8 (transfers of partnership interests).  Of particular relevance

is § 8.5:

> At any time after October 1, 2005, SCCTC, its successors and
> assigns, shall have the right to purchase, and the General
> Partner and the other Limited Partners shall have the right to
> sell to SCCTC, its successors and assigns, all of the
> Partnership Interests in the Partnership of the General Partner
> and the other Limited Partners . . . .

The balance of § 8.5 concerns the mechanism of determining the purchase price to be

paid by SCCTC for this "put and call" provision.

The two debtors are limited liability companies formed in 2000 under the

Delaware Limited Liability Company Act.  Ex. LTI-1 (tabs 1, 2).  The debtors have

identical members, 1 N.T. at 49, which the debtors have placed into four groups: Edwards

Group (43.3%); Coughlin Group (30.8%); Cook Group (25.5%); and Miller Group

(0.4%).  Ex. D-4.  Ms. Carolyn Copp, listed as an interest holder in the Cook Group, is the

president of both debtors and serves on their management committees. 1 N.T. at 48.  She

is also the president of SCCCC, LP, 1. N.T., at 51, and chairman and chief executive

officer of SCTC.  Ex. LTI-1 (tab 5C).  Mr. Frank Coughlin, an interest holder in the

Coughlin Group, is the president of LTI.  3 N.T., at 87.

The debtors' schedules list about $19,000 in assets for each debtor, aside

from the value of  their partnership interests in SCCCC, LP.  Exs. LTI-1 (tabs 8A-9A).

Most of the value of the debtors' non-partnership assets stems from their interests in

"CoBank participation certificates."  Id.  SCCTC has no assets besides its limited

partnership interest.  1 N.T., at 47.

The seeds of the present dispute were planted in October 2000, when SCCI

and SCCE entered into a loan agreement with CoBank, ACB, eventually borrowing

3

around $7.5 million to purchase their partnership interests in SCCCC, LP, as well as

working capital.  Exs. LTI-1 (tabs 4A-4C); D-10, at 9-10.  In addition to obtaining a

security interest in both debtors' assets, ex. LTI-1 (tabs 4D-4H), CoBank also received

partnership-interest pledge agreements from each of the debtors.  Ex. LTI-1 (tabs 5A-5B).

Moreover, it obtained a similar pledge agreement from non-debtor SCTC.  Ex. LTI-1 (tab

5C).  These pledge agreements stated, in part:

> Upon the occurrence and during the continuance of an Event
> of Default and subject to the provisions of Section 13 of this
> Pledge Agreement, all rights of the Pledgor to exercise its
> voting, consensual and other powers of ownership pertaining
> to the Collateral [with Collateral having been previously
> defined to include partnership interests] shall become vested
> in the Secured Party upon two day's prior written notice from
> Secured Party to Pledgor and the Pledged Partnership, and
> thereupon Secured Party shall have the sole exclusive
> authority to exercise such voting, consensual and other
> powers of ownership which Pledgor shall otherwise be
> entitled to exercise. . . .

Ex. LTI-1 (tabs 5A § 4; 5B § 4; and 5C § 4).  An event of default under the pledge

agreements included non-payment of the CoBank promissory note.

In April 2001, a loan agreement was signed wherein SCTC consented to use

all partnership distributions it thereafter obtained from SCCCC, LP toward the repayment

of the CoBank loan obligation, since assigned to LTI.  See ex. LTI-2 (tab 19) (letter

agreement dated April 10, 2001 between SCTC and the two debtors); see also 1 N.T., at

58.[2]

---

[2]The SCTC contributions to the debtors from SCCCC, LP distributions are treated
as loans payable upon the sale of the limited partnership interest and accruing interest at 6% per
annum.  Ex. LTI-2 (tab 19).

The debtors have also scheduled undisputed, unsecured loan obligations owed to SCTC in the amounts of $8,785.04 for SCCI (ex. LTI-1 tab 8D) and $349,644.47 for SCCE. Ex. LTI-1 (tab 9D); see also ex. LTI-2 (tab 19) (loan in the amount of $254,986.22 on Dec. 31, 2007 accruing interest at 6%). In addition, they scheduled undisputed, unsecured obligations owed to SCCCC, LP in the amounts of $2,814.11 for SCCI and $112,001.71 for SCCE. Ex. LTI-1 (tabs 8D and 9D); see also ex. LTI-2 (tab 19).[3]

On May 1, 2003, CoBank gave written notice that the debtors were in default in their loan payments. Ex. LTI-1 (tab 6). CoBank, however, did not give written notice that it was exercising its rights under the pledge agreements; nor did it undertake any other collection efforts. Ex. D-10, at 12. In October 2007, CoBank assigned its secured loan interests to LTI. Id. On January 23, 2009, LTI provided written notice to the debtors, SCTC and SCCCC, LP that the May 2003 loan default remained outstanding and that LTI was exercising its rights under section 4 of the three pledge agreements.[4] The January 23rd notice further stated that LTI intended to commence state court litigation (in Colorado, as permitted by loan documents) to "confirm" its rights under the pledge agreements. Ex. LTI-1 (tab 7).

On January 23, 2009, LTI commenced litigation in Colorado state court against the two debtors (SCCI and SCCE) as well as against SCTC. Ex. D-24. In its complaint, LTI sought monetary damages for breach of the loan agreements, as well as a

---

[3]By virtue of Rule 3003(b)(1), the debtors' schedules constitute proofs of claim on behalf of SCCCC, LP and SCTC.

[4]Ms. Copp acknowledged that the CoBank loan was in default at the time of the debtors' bankruptcy filings. 2 N.T., at 63.

declaration of its rights under section 4 of the pledge agreements.  Id.  After that litigation

was filed, but before the expiration of the two-day period provided in section 4 of the

pledge agreements, on January 25, 2009, SCCI and SCCE filed voluntary petitions in

bankruptcy under chapter 11.  See 1 N.T., at 54.  These bankruptcy filings stayed the

Colorado litigation as to the debtors, but not as to SCTC.  The debtors and LTI agree that

the Colorado litigation against SCTC is still pending.

LTI timely filed a secured proof of claim in both bankruptcy cases.

(Docketed as proofs of claim #3.)  LTI therein asserts that $13,534,231.78 is owed jointly

by SCCI and SCCE.  The debtors have commenced an adversary proceeding against Mr.

Coughlin and LTI.  As to the latter, they have also filed an objection to the secured proofs

of claim.  For purposes of this confirmation dispute, the proposed joint plan provides in ¶

2.22 that LTI, as a creditor, will be treated as though it holds secured claims in the

amounts it has asserted in its proofs of claim "for the limited purposes of determining

feasibility of the Plan and for allowing LTI to vote on the Plan. . . ."  Exs. D-1, LTI-1 (tab

11).  For plan distribution purposes, however, LTI will also receive payment on its

secured claims after the debtors' objection has been determined and its claim is allowed.


B.


As mentioned earlier, SCCCC, LP is a telecommunications company

providing wireless services to customers in a rural portion of northeastern Pennsylvania.

It has 26 cell sites, of which five are owned and the balance are leased.  Ex. D-25, at 45.

As of September 2009, it had 7,066 subscribers.  Id., at 46.  As of October 2009, SCCCC,

LP valued its tangible and intangible assets at about $30 million, of which more than
$8,700,000 was in cash, and its liabilities at only about $2 million.  Ex. D-18.  Its gross
revenues have increased from roughly $10 million in 2007 to more than $16.5 million
anticipated for 2009.  Ex. D-20.  For 2009, SCCCC, LP expects a gross profit of almost
$12.7 million, and net income of more than $7 million.  Id.  It generates 87% of its
revenue from roaming charges, almost all of which are paid by customers of Verizon
Wireless.  Exs. D-20; D-25, at 45.  SCCCC, LP has a contract with Verizon specifying
roaming rates through 2013, with renewal options available.  Ex. D-25, at 45; 2 N.T., at
21.

Using a discounted income approach, Mr. William Redpath, a vice
president of BIA/Kelsey and the expert engaged by the debtors' counsel, projected
continued SCCCC, LP growth in roaming revenues, subscriber revenues, and total
revenues for the next 8 years, although he anticipated a declining growth rate from the
present rate of increase.  Ex. D-25, at 58 (unpaginated).  Similar growth is projected for
EBITDA and cash flow for the next 8 years.  Id., at 59, 60 (unpaginated).  Using a
discount rate of 15.82% upon anticipated net free cash flow,[5] this expert opined that
SCCCC, LP had a fair market value of almost $53 million as a going concern as of
November 30, 2009, plus  cash on hand, less liabilities.  Id., at 61-62.  Thus, the value of

---

[5]Mr. Redpath's discounted cash flow methodology projected SCCCC, LP's
revenues, capital expenditures and "working capital change," estimated tax obligations, and
computed "net free cash flow," all through 2017. The net free cash flow was then discounted by
15.82%.  The discounted net free cash flows through 2017 were then added and the result is his
opinion of the enterprise value of SCCCC, LP.  Ex. D-25, tables 9, 10.  The projected revenues
used by Mr. Redpath were provided by SCCCC, LP, then reduced by him by about 1% for 2010,
with the reduction increasing by one percent in each of the following years until in 2017 the
reduction is about 10% from SCCCC, LP's projection.  Compare ex. D-20 with ex. D-25 table 8.

SCCE's 39.8% partnership interest was opined to be $24.6 million and SCCI's 1% interest was valued at $618,500.  Id., at 2 (unpaginated).[6]

LTI offered its own expert, Mr. William E. King, president of JSI Capital Advisors.  Mr. King did not value SCCCC, LP or the debtors' interests therein, see 3 N.T., at 25, but opined that Mr. Redpath had overestimated the value of SCCCC, LP by underestimating the risks inherent in projected future revenues of SCCCC, LP.

Mr. King asserted that "there exists significant risk that actual future roaming revenues . . .  will differ materially from projected future roaming revenues. . . ." Ex. LTI-3, at 3. Since about 85% of SCCCC, LP's revenues are derived from roaming charges, almost all of which are incurred by Verizon Wireless, 2 N.T., at 14, any projections that overstate anticipated roaming revenue from Verizon Wireless would overstate projected cash flow and thus overestimate the value of the limited partnership. 3 N.T., at 33.

This risk of reduced roaming revenue exists, in Mr. King's opinion, because of the realistic possibility that Verizon Wireless might either establish its own wireless network in Pennsylvania Region 5, referred to as an "overbuild," or Verizon Wireless might enter into a less expensive roaming agreement with another wireless provider in the future. Ex. LTI-3, at 4-12.  The overbuild possibility was the greatest concern according to Mr. King.  3 N.T., at 34.  Mr. King further opined that Verizon Wireless was the entity most likely to purchase the going-concern assets of SCCCC, LP (followed by TDS and SCCTC), 3 N.T., at 44, but he believed that the possibility of such a purchase by Verizon

---

[6]Mr. Redpath opined that there was no reason to discount the non-majority partnership interests of the two debtors.  2 N.T. at 11.  LTI's expert, Mr. King, did not challenge that conclusion.

Wireless would likely wane in the near future. Ex. LTI-3, at 18; 3 N.T., at 45, 67.

Therefore, in his opinion, a prompt sale is necessary to maximize the sale value of the

limited partnership. Id., at 67-68.

Ms. Copp testified that, as president of SCCCC, LP, she intended to

continue using the limited partnership's cash to upgrade its wireless network, rather than

preserve capital to make any distributions at present to limited partners.[7] 1 N.T., at 82-84,

86-90. LTI's expert agreed that the absence of an upgraded network would adversely

affect future revenues. 3 N.T., at 60-62.

Although LTI's expert did not place a fair market value upon SCCCC, LP,

and he believes that the appraised value given by Mr. Redpath was overstated, for

purposes of this contested matter LTI agrees with the debtors' contention that LTI holds

oversecured claims against the debtors. 4 N.T, at 46-47. That is, even if I were to

conclude that Mr. Redpath overvalued SCCCC, LP, LTI acknowledges that the value of

the debtors' interests in the limited partnership exceeds the amount owed by them to LTI.

Therefore, if LTI's allowed claim is determined to be about $13.5 million, then LTI

concedes that the value of the limited partnership must exceed $34.3 million, given the

debtors' combined 40.8% interest. See also 3 N.T., at 42-43 (reducing Mr. Redpath's

increasing revenue projections by 10%, as suggested by Mr. King, yields an enterprise

value of $37 million).

Because both experts agree that a prompt sale (occurring within 12 months)

of SCCCC, LP would result in distributions to the limited partners that would provide for

---

[7]The debtors argue, as will be mentioned below, that the limited partnership is
precluded from making distributions to the limited partners because of the CoBank loan default.

payment in full of LTI's claim (and the claims of other creditors), I need not determine in

this contested matter the extent, if any, that the debtors' proposed valuation is overstated

as argued by LTI.


### C.


The parties, as is appropriate, focus upon certain specific terms of the

proposed second amended joint plan, exs. D-1; LTI-1 (tab 11), in support of their

respective positions regarding confirmation.  Those terms particularly relevant to this

dispute are as follows.

The "effective date" of the proposed plan "means twenty (20) Business

Days after the date the Confirmation Order becomes a Final Order."  Plan, ¶ 2.20.  A

"final order" is defined in the plan as:

> an order of the [Bankruptcy Court] (or other court of
> competent jurisdiction) as to which (a) any appeal that has
> been taken has been determined finally or dismissed and such
> order has not been appealed, reversed, stayed, modified or
> amended and (b) the time for appeal or for requesting
> reargument or further review or rehearing has expired and no
> motion or similar pleading having the effect of tolling or
> otherwise extending the time to file an appeal or any such
> request has been filed and not yet determined . . . .

Plan, ¶ 2.23.  Therefore, were LTI to file an appeal from a confirmation order, the

effective date of the plan would be delayed.

In addition, an "allowed claim" means, _inter alia_, a claim "as to which

Claim an objection to the Claim has been interposed, which objection has been resolved

by a Final Order to the extent such objection is determined in favor of the holder of such

Claim.  Unless otherwise specified, 'Allowed Claim' shall not include interest on the principal amount of such Claim accruing from or after the Petition Date."  Plan, ¶ 2.4.  As will be discussed below, the debtors have since modified this provision.

There are three classes of claims under the proposed plan.  LTI's secured claim is in class 1.  General unsecured claims are in class 2.  And equity interest holders, i.e., the membership interests in the debtors, are placed in class 3.  Plan, ¶ 4.1.

The treatment of LTI's claim is found in Article VI of the plan.  Paragraph 6.1 states that "LTI will receive the following in full satisfaction, payment and discharge of LTI' s Allowed Claim, if any:

> (a) LTI will be paid in full the amount of its Allowed Claim from distributions from the LP to Debtors and SCTC of cash on hand of the LP and/or the sale proceeds of the LP or the proceeds of Debtors' interests in the LP.
>
> (b) If LTI's Claim is expunged or allowed in an amount not exceeding $3,500,000.00, Debtors will pay the Allowed Claim in full on the later of the Effective Date or the date on which LTI's Claim becomes an Allowed Claim pursuant to a Final Order.
>
> (c) If LTI's Claim is an Allowed Claim in an amount exceeding $3,500,000.00, LTI shall be paid as follows.  Until full and complete satisfaction of its Allowed Claim, if any, LTI shall retain all of its liens and security interests granted to LTI as successor lender and assignee from CoBank . . . . Interest will accrue on account of LTI's Allowed Claim as the same may be reduced by payments from time to time, at the per annum rate of 6% from the date when an order allowing LTI's Claim becomes a Final Order until the date that LTI's Allowed Claim is paid in full. . . .  If LTI's Claim becomes an Allowed Claim, Debtors shall pay LTI interest payments quarterly in arrears. . . .  A balloon payment of LTI's Allowed Claim (if any) plus all accrued and unpaid interest thereon shall be made on the earlier of (i) the date of closing of the sale of the LP; or (ii) one year after the Effective Date.

Within 60 days after LTI's allowed claim has been paid in full, the allowed claims of general unsecured creditors will be paid in full. And after all allowed claims have been paid, interest holders may receive a distribution under the plan. Plan, ¶¶ 6.2, 6.3. Since the proposed joint plan does not require full payment to these classes of claims or interests on the effective date of the plan, all three classes are impaired under section 1124.

The proposed joint plan provides for the assumption, under section 365, of the October 2000 Limited Partnership Agreement, as amended,[8] as well as the April 2001 contribution agreement with SCTC. Plan, ¶ 8.1. The proposed joint plan is to be funded as follows:

> Debtors shall fund payments to be made under the Joint Plan by distributions from the LP to SCTC and the Debtors of net income of the LP, pursuant to the terms of the Partnership Agreement and/or from proceeds from the sale of the LP or sale of the Debtors' interests to South Canaan Cellular Telephone Company pursuant to the Partnership Agreement. The LP will be put on the market by SCCI on or before the Effective Date and such sale shall close within twelve (12) months of the Effective Date. If, four (4) months following the Effective Date, no buyer for the LP is procured or no offer submitted that is acceptable to Debtors, Debtors shall exercise their rights under Section 8.5 of the Partnership Agreement attached hereto as Exhibit "C" and sell their partnership interests to South Canaan Cellular Telephone Company whereupon the Joint Plan shall be funded from the proceeds of the sale of the partnership interests.

Plan, ¶ 9.1.

---

[8] See generally 6 Norton Bankruptcy Law & Practice 3d § 120:2 (2009) ("[A] majority of courts have held that absent some countervailing fact, a partnership agreement is generally going to be an executory contract.").

Paragraph 10.6 states that, unless provided for in the confirmation order, all creditors are enjoined after the effective date from all litigation, collection and enforcement actions against the debtors for the earlier of either 18 months after the effective date or the debtors' default under the confirmed plan.  Paragraph 10.7 would similarly enjoin LTI from asserting any claim against SCTC, including prosecuting in state court or taking any other enforcement or collection activities, after the plan's effective date for the earlier of 18 months or the date of the debtors' default under the plan.

Paragraph 10.8, styled "No Waiver of Discharge" states:

> Except as otherwise specifically provided herein, nothing in the Joint Plan shall be deemed to waive, limit or restrict in any way the discharge granted to the Debtors upon confirmation of the Joint Plan by section 1141 of the Bankruptcy Code.

Paragraph 12.1 of the proposed plan identifies Ms. Copp as continuing as president of the debtors after confirmation and specifies the managers of the limited liability company debtors.

Paragraph 12.2 is an exculpation provision that frees the debtors, their managers, professionals and agents from liability for actions taken in connection with these chapter 11 cases, except for willful misconduct or gross negligence.

Finally, the proposed plan states that its provisions are "severable" if any particular provision is determined to be "invalid, void or unenforceable and if such provision(s) are excised, re-solicitation of the joint proposed plan is not necessary unless ordered by this court."  Plan, ¶ 12.5.

After the confirmation hearing concluded, the debtors and LTI submitted memoranda and supplemental memoranda in support of, and in opposition to,

13

confirmation.  In their joint supplemental memorandum, the debtors proposed to modify

certain provisions of their proposed plan.  Most relevant to LTI's objections are these:

> "LTI's Allowed Claim" means the amount of LTI's Claim
> that has been allowed by order of this Court, plus interest
> accrued from the Petition Date through the Effective Date at
> the rate of interest decided by the Bankruptcy court in
> connection with the Adversary Proceeding.

Amended ¶ 2.30.  Further, Amended ¶ 6.2(c), (d) would provide that if LTI is determined

to hold an allowed claim exceeding $3.5 million, this claim will be repaid in full with

interest at the rate of 6% from the effective date of the plan.

At the confirmation hearing, Ms. Copp described the material terms of the

debtors' joint amended plan as follows:

> Under the plan, the company is offered for sale on or before
> the effective date of the plan and the sale is to be completed
> within one year of the effective date of the plan.  And the
> proceeds from the sale, which would be distributed to the
> debtors, along with cash on hand, that would be distributed to
> the debtors, would be contributed to pay the debtors' claims.
> And with respect to the LTI claim, to the extent that it's
> needed, the cash distributed to the telephone company
> [SCTC] and sale proceeds distributed to the telephone
> company, would also be made available to satisfy LTI's
> allowed claim.
>
> Q. So, what exactly, does the plan require SCCI to do after
> the effective date of the plan?
>
> A. Continue to operate the company, offer the company for
> sale and if the sale doesn't seem to be developing very well by
> the end of the fourth month, if there's not, I guess, a sale
> agreement, that would be, I guess, an approved agreement,
> then SCCI would exercise the put to TDS – to FCCTC [sic].
>
> ***
>
> Q. When does the plan propose that the LP will be put on the
> market?
>
> A. On or before the effective date.

14

> Q. In your mind, is putting the LP on the market and selling it, optional?
>
> A. No.

1 N.T., at 56, 70.

At the time of the confirmation hearing, the debtors had not retained a broker or sale professional to begin marketing SCCCC, LP.  2 N.T., at 71.  Moreover, given the provision of the plan that any sale price has to be acceptable to the debtors, Mr. Coughlin was less sanguine than Ms. Copp that the debtors would conduct a prompt sale of SCCCC, L.P.:

> I think our main concerns are its [the proposed plan terms] are very open-ended.

3 N.T., at 87.

### D.

Although SCCTC is not a creditor of the debtors, it claimed status as a party in interest under 11 U.S.C. § 1109(b), owing to the debtors' plan provision providing for the assumption of the limited partnership agreement under 11 U.S.C. § 1123(b)(2).  See generally In re Hemex Liquidation Trust, 129 B.R. 91, 95 (Bankr. W.D. La. 1991).  As mentioned earlier, SCCTC is a wholly-owned subsidiary of United States Cellular Corp., the latter entity described as providing cellular services to 6.1 million subscribers, with projected revenues for 2009 of almost $7 billion.  1 N.T., at 16-17.  SCCTC was formed in 1988, and U.S. Cellular made a capital investment when the SCCCC, LP limited

partnership was reconstituted in 2000.  Id.  U.S. Cellular has purchased and sold "several

hundred" cellular telephone companies.  1 N.T., at 17.

SCCTC supports the debtors' jointly proposed chapter 11 plan.  1 N.T., at

24, 32-33.  Furthermore, it does not oppose the debtors' proposed assumption of the

limited partnership agreement.  1 N.T., at 25.  In taking this position, SCCTC is aware

that the plan has a contingency by which the debtors would exercise the "put" provision

of the limited partnership agreement; moreover, in the event of such contingency

occurring, SCCTC (through the testimony of an officer of TDS, who is its general counsel

and who has been involved with SCCTC matters for many years, 1 N.T. at 9, 16, with

TDS being the 80% owner of U.S. Cellular, and with TDS directing "all development

activity" of U.S. Cellular, see 1 N.T., at 24) states that it would honor its contractual

obligation and purchase the interests of the other limited partners.  1 N.T. at 27.  As

SCCTC has no assets other than its limited partnership interest, 1 N.T., at 47, U.S.

Cellular would have to provide the funding for SCCTC to comply with its "put"

obligation.  The debtors believe that U.S. Cellular has the financial ability to fund

SCCTC's purchase of the other limited partnership interests.  2 N.T., at 82.[9]

To the extent the proposed joint plan results in a sale offer from a third

party to purchase SCCCC, LP, SCCTC has no general opposition to such a sale, but with

the belief that such a sale is conditioned upon SCCTC's approval of the final sale terms.

---

[9]LTI dismisses this testimony as inadmissible, believing that it was necessary for
an officer or director of SCCTC to testify about funding for the "put" provision.  There are two
directors of SCCTC: the president/ chief executive officer of U.S. Cellular; and the chairman of
U.S. Cellular, who is also the president of TDS.  1 N.T. at 16.  SCCTC must rely upon U.S.
Cellular for funding, and U.S. Cellular will take direction from TDS.  Thus, the testimony of an
officer of TDS who is knowledgeable regarding SCCTC and TDS's position regarding the
proposed joint plan and "put" provision, 1 N.T. at 22-24, was admissible and relevant.

1 N.T., at 32-37.  (Ms. Copp, while stating that she would seek SCCTC's concurrence, was uncertain whether SCCTC could veto any sale.  2 N.T., at 67-68.)

In contrast to this position, SCCTC filed a document with this court, docket #266, opposed to LTI's own proposal to sell SCCCC, LP.[10]  Nor does it support LTI directly, or through an agent, managing the limited partnership.

Although consenting to the debtors' proposed plan, SCCTC, as it was neither a creditor nor interest holder, did not vote as part of the confirmation process.  The report of plan voting, ex. D-12, states that class 1, consisting only of the claims of LTI, voted to reject the jointly proposed plan.  Class 2, the claims of unsecured creditors, voted in favor of the joint plan, as did class 3, the class of interest holders.  Id.

The actual ballots from class 2 unsecured creditors were offered in evidence and all accepted the plan.  Only three entities voted: Bauknight, Pietras and Stormer, P.A. ("Bauknight"), prepetition accountants for the debtors, holding a claim against SCCI in the amount of $2,450 and against SCCE in the amount of $650; SCTC, asserting an unsecured claim of about $358,000, whose ballot was signed by Ms. Copp as its chairman; and  SCCCC, LP, which voted its roughly $115,000 claim.  Ex. D-12.  All of the class 3 interest holders voted to accept the plan, with the exception of Mr. Coughlin who abstained.

The two law firms that have represented the debtors in their chapter 11 cases have signed "waivers" under section 1129(a)(9), stating their agreement that any allowed administrative expenses held by these law firms shall not be paid until the

---

[10]LTI has filed a competing chapter 11 liquidation plan.  That plan will be considered for confirmation if the debtors' joint plan is not approved.

allowed claim of LTI is repaid in full under the terms of the debtors' confirmed plan.

Exs. D-30, D-31.

Finally, as of December 11, 2009, the prime rate of interest was listed at

3.25%.  Ex. D-27.  The debtors' proposed plan calls for LTI to receive 6% interest on its

allowed secured claim from the effective date until repaid in full.  Interest payments are to

be made quarterly.


II.


As noted earlier, the only objection to confirmation of the debtors' joint

proposed chapter 11 plan comes from LTI.  LTI holds a secured claim on the debtors'

assets, which value consists primarily of their limited partnership interests in SCCCC, LP.

Although the debtors and LTI agree that the value of these interests exceed the amount

owed to LTI (estimated for confirmation purposes only at more than $13.5 million) and

although the debtors have proposed a plan calling for the sale of the limited partnership (a

result supported by LTI given the overall nature of its objections) nonetheless LTI

opposes confirmation of this plan.

> LTI (acting through Mr. Coughlin) believes:
>
> [T]he Debtors' only goal [in proposing this plan] is to delay.
> The Debtors, and specifically Ms. Copp, cling to the
> impractical business plan to delay and avoid the sale of the
> LP, in the face of enormous business and market risks.

LTI's Supplemental Memorandum, at 1.  In other words, LTI asserts that Ms. Copp has

proposed a plan that does not absolutely require the sale of SCCCC, LP, and believes that

she intends to use the post-confirmation period simply to litigate the amount of LTI's

claim in the (vain) hope that such litigation will limit the amount owed, so that Ms. Copp

may use the undistributed cash held by SCCCC, LP to repay LTI while retaining

managerial control of the limited partnership.  In LTI's view, such litigation and delay

strategy represent a futile challenge to a simple assignment of valid claims held by

CoBank, and the debtors' intended delay will result only in the reduction of value of

SCCCC, LP to the detriment, primarily, of LTI.

The debtors (acting through Ms. Copp) believe that LTI's (and Mr.

Coughlin's) true intention is to obtain control of SCCCC, LP for its own benefit by

defeating any chapter 11 plan proposed by the debtors and ultimately assuming control of

SCTC's and the debtors' interests in SCCCC, LP, including the powers of the general

partner.  LTI, in the debtors' view, hopes to obtain control of an entity worth, according

to the debtors, $60 million, with LTI having paid (improperly, the debtors believe) a

relatively small sum to CoBank, while taking advantage of Ms. Copp's efforts to turn the

SCCCC limited partnership into a valuable business.  Such an LTI takeover of SCCCC,

LP would, Ms. Copp asserts, result in the loss of millions in equity currently held by the

debtors' members and the unjust enrichment of Mr. Coughlin.  See Debtors'

Memorandum in Support of Confirmation, at 20.

Neither Mr. Coughlin's nor Ms. Copp's viewpoint is entirely consistent

with all of the facts presented.  For example, the proposed plan does not call for any delay

in the sale process pending the debtors' objection to LTI's proofs of claim.  In addition,

LTI's assertion that the debtors' plan imposes risks primarily upon LTI fails to account

for the position of SCCTC, the TDS controlled entity that holds a 49% interest in the

limited partnership and that presumably would not allow its investment to be substantially

diminished by risky behavior on the part of Ms. Copp.  Yet, SCCTC supports the debtors'
proposed plan, as do the debtors' equity members who are not related to Ms. Copp and
who would also be at risk if the value of the limited partnership diminished.  Moreover,
the evidence revealed that Ms. Copp receives only modest compensation for her
managerial positions with SCCCC, LP and the debtors.  Thus, it is unlikely that the
debtors' proposed plan is designed by Ms. Copp to permit her to continue receipt of such
compensation.

Similarly, the debtors' contention that LTI is intending a takeover of the
limited partnership to the detriment of the limited partners and the equity members of the
debtors overlooks the ability of SCCTC to prevent that occurrence.  SCCTC presently has
the contractual right to "call" or purchase the other 51% partnership interests at any time
it chooses. Therefore, to the extent SCCTC opposes Mr. Coughlin's attempt to manage
the limited partnership, it has the power to prevent it.  And, at present, the position of
SCCTC filed with this court suggests that it would not be content to allow LTI to obtain
control of SCCCC, LP.

Putting aside these undercurrents of beliefs and motivations that the debtors
and LTI impute to each other, I find that the numerous objections to confirmation raised
by LTI fall into two primary categories.  First, LTI contends that the debtors' proposed
chapter 11 plan is not feasible.  Second, LTI argues that the terms of the proposed plan

are not "fair and equitable" as to its secured claim.  Although these are the two main

objections, there are also a number of miscellaneous or related objections.[11]


III.


Confirmation of a chapter 11 plan requires that the plan proponent meet all

the requirements of section 1129(a), see, e.g., In re Dupell 2000 WL 192972, at *3

(Bankr. E.D. Pa. 2000); In re Future Energy Corp., 83 B.R. 470, 481 (Bankr. S.D. Ohio

1988), except that of subsection 1129(a)(8) (requiring every impaired class of claims or

interests to accept the plan).  If all the provisions of section 1129(a) are established, save

those of subsection 1129(a)(8), then the plan proponent can seek confirmation under

section 1129(b).  See 7 Collier on Bankruptcy, ¶ 1129.02[8] (16th ed. 2009) ("The

condition set forth in section 1129(a)(8) is the only condition precedent which is not

absolutely necessary for confirmation.  If a plan satisfies the confirmation criteria set

forth in section 1129(a), including the requirement that if a class of claims is impaired, at

least one impaired class of claims accepts the plan, the plan may be confirmed

notwithstanding the opposition of one or more impaired classes of claims or interests,

provided the plan satisfies section 1129(b).").

Here, the debtors concede that not every impaired class of creditors has

accepted their proposed amended chapter 11 plan.  LTI, the only claim in class 1, does

---

[11]In considering LTI's objections to confirmation, I have considered only those
addressed in its post-hearing memoranda.  See generally Bearley v. Friendly Ice Cream Corp.
322 F. Supp. 2d 563, 575 n.3  (M.D. Pa. 2004); Argus Group 1700, Inc. v. Steinman, 206 B.R.
757, 763 n.10 (E.D. Pa. 1997).

21

not; and LTI's claim may not be repaid until months after the effective date of the confirmed plan.  Thus, the debtors concede that class 1 is impaired under 11 U.S.C. § 1124.  See generally In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 205 (3d Cir. 2003). Accordingly, they seek confirmation under section 1129(b)—the fair and equitable provision.  See generally In re Armstrong World Industries, Inc., 432 F.3d 507, 509-10 (3d Cir. 2005).

Although LTI challenges that the requirements of section 1129(b) have been established, it also contends vigorously that section 1129(a)(11), the feasibility provision, has not been proven.  Unless the plan is feasible, a court need not consider the other objections.  See, e.g., In re Dupell 2000 WL 192972, at *6.

Section 1129(a)(11) provides:

> (a) The court shall confirm a plan only if all of the following requirements are met:
>
> ***
>
> 11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Thus, to be confirmed, every chapter 11 plan must be "feasible" by virtue of section 1129(a)(11).

> Section 1129(a)(11) codifies the feasibility requirement and requires that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the plan. 11 U.S.C. § 1129(a)(11).  To allow confirmation, the bankruptcy court must make a specific finding that the plan as proposed is feasible. . . .  The standard of proof required by the debtor to prove a Chapter 11 plan's feasibility is by a preponderance of the evidence . . . .

> In determining whether a debtor's Chapter 11 plan of
> reorganization is feasible, we noted in <u>Briscoe</u> that "the
> [bankruptcy] court need not require a guarantee of success . . .
> [o]nly a reasonable assurance of commercial viability is
> required." <u>Id.</u> at 1165-66. . . . All the bankruptcy court must
> find is that the plan offer "a reasonable probability of
> success." <u>In re Landing Assoc., Ltd.</u>, 157 B.R. 791, 820
> (Bankr. W.D. Tex. 1993).

<u>Matter of T-H New Orleans Ltd. Partnership</u>, 116 F.3d 790, 801 (5th Cir. 1997) (citations

omitted); <u>see</u> <u>generally</u> <u>In re Continental Airlines</u>, 91 F.3d 553, 563 (3d Cir. 1996).

More recently, the Eighth Circuit Court of Appeals explained:

> While a reorganization plan's "[s]uccess need not be
> guaranteed," <u>In re Monnier Brothers</u>, 755 F.2d at 1341, [infra]
> the bankruptcy court cannot approve a plan unless it has at
> least a reasonable prospect for success. <u>See</u> <u>id.</u> . . . The
> debtors bear the burden of establishing the feasibility of their
> plans by a preponderance of the evidence.

<u>In re Danny Thomas Properties II Ltd. Partnership</u>, 241 F.3d 959, 963 (8th Cir. 2001).

The purpose of the chapter 11 feasibility requirement is to prevent

confirmation of "visionary schemes." <u>See</u> <u>Matter of Pizza of Hawaii, Inc.</u>, 761 F.2d

1374, 1382 (9th Cir. 1985); 7 <u>Collier on Bankruptcy</u>, ¶ 1129.02[11] (16th ed. 2009).

Although section 1129(a)(11) does not require that compliance with proposed plan terms

be guaranteed, there must be a "reasonable prospect of success" and the plan must be

"workable." 7 <u>Collier on Bankruptcy</u>, ¶ 1129.02[11] (16th ed. 2009); <u>see</u>, <u>e.g.</u>, <u>In re Pikes</u>

<u>Peak Water Co.</u>, 779 F.2d 1456, 1460 (10th Cir. 1985); <u>In re Clarkson</u>, 767 F.2d 417, 420

(8th Cir. 1985); <u>In re Monnier Bros.</u>, 755 F.2d 1336, 1341 (8th Cir. 1985); <u>Corestates</u>

<u>Bank, N.A. v. United Chemical Technologies, Inc.</u>, 202 B.R. 33, 45 (E.D. Pa. 1996); <u>In re</u>

<u>Sugarhouse Realty, Inc.</u>, 192 B.R. 355, 366 (E.D. Pa. 1996).

23

Accordingly, in these chapter 11 cases, the debtors have the evidentiary

burden to demonstrate that there is a reasonable likelihood that they can fulfill the

promises made to creditors and interest holders by their jointly proposed plan.  Their

sincerity and belief in their own ability to do so, however, is insufficient to meet this

burden.

> Feasibility, as noted in the case of In re Bergman . . .
> contemplates "the probability of actual performance of the
> provisions of the plan.  Sincerity, honesty and willingness are
> not sufficient to make the plan feasible, and neither are
> visionary promises.  The test is whether the things which are
> to be done after confirmation can be done as a practical matter
> under the facts."

In re Hoffman, 52 B.R. 212, 215 (Bankr. D.N.D. 1985) (quoting Matter of Bergman, 585

F.2d 1171 (2d Cir. 1978)); see also In re Walker, 165 B.R. 994, 1004 (E.D. Va. 1994).

Before considering LTI's specific issues regarding feasibility, I note that the

objector's position that "there must be a present and absolute certainty of the debtor's

ability to fund the proposed treatments under the plan," citing In re Christian Faith

Assembly, 402 B.R. 794, 800 (Bankr. N.D. Ohio 2009), LTI Memorandum, at 14, sets too

high an evidentiary standard for compliance with section 1129(a)(11).  As noted above,

"[t]he feasibility requirement commands the debtor to demonstrate 'reasonable prospects

of financial stability and success.  It is not necessary that success be guaranteed, but only

that the plan present a workable scheme of organization and operation from which there

may be a reasonable expectation of success.'"  Corestates Bank, N.A. v. United Chemical

Technologies, Inc., 202 B.R. at 45 (quoting 5 Collier On Bankruptcy ¶ 1129.02[11] (15th

ed. 1991)).  "[T]he possibility of failure is not fatal" to confirmation.  7 Collier on

Bankruptcy, ¶ 1129.02[11] (16th ed. 2009).

24

Furthermore, as noted above, evidence of feasibility need be proven only by a preponderance standard.  See, e.g., Corestates Bank, N.A. v. United Chemical Technologies, Inc., 202 B.R. at 45.

IV.

Because LTI and the debtors agree for purposes of feasibility that LTI's secured claim is about $13.5 million, and because the plan proposes to repay LTI's allowed secured claim in full, in order for the debtors' proposed plan to be feasible under section 1129(a)(11) the debtors have the burden to demonstrate reasonable prospects for plan funding—either from the sale of the limited partnership, with distributions then made to the limited partners, including the debtors, or from the sale of the debtors' interests in the limited partnership.  LTI has acknowledged that the value of the debtors' combined interests in the limited partnership exceeds the amount of its claim, i.e., that LTI holds an oversecured claim.  Thus, the debtors have demonstrated by the preponderance standard that either the sale of SCCCC, LP or the sale of their interests could generate enough proceeds to satisfy LTI's claim in full.[12]  However, LTI contends that the evidence did not demonstrate that either sale was likely to occur.  The debtors disagree.

As quoted earlier, the relevant provision of the proposed plan, ¶ 9.1, states:

---

[12]Moreover, the agreement by SCTC to use its distribution proceeds from the sale of SCCCC, LP further establishes that those proceeds would be sufficient to repay LTI's allowed claim in full.

Debtors shall fund payments to be made under the Joint Plan
by distributions from the LP to SCTC and the Debtors of net
income of the LP, pursuant to the terms of the Partnership
Agreement and/or from proceeds from the sale of the LP or
sale of the Debtors' interests to South Canaan Cellular
Telephone Company pursuant to the Partnership Agreement.
The LP will be put on the market by SCCI on or before the
Effective Date and such sale shall close within twelve (12)
months of the Effective Date.  If, four (4) months following
the Effective Date, no buyer for the LP is procured or no offer
submitted that is acceptable to Debtors, Debtors shall exercise
their rights under Section 8.5 of the Partnership Agreement
attached hereto as Exhibit "C" and sell their partnership
interests to South Canaan Cellular Telephone Company
whereupon the Joint Plan shall be funded from the proceeds
of the sale of the partnership interests.

LTI maintains in its post-hearing memoranda that plan feasibility is lacking

for the following reasons: (1) debtors retain too much discretion as to terms of any

eventual sale of SCCCC, LP; (2) any proposed sale of the limited partnership would be

contingent upon approval by SCCTC, and that entity has not given its approval; (3) the

debtors have not properly obtained SCTC's consent to the assumption of the partnership

agreement, because SCTC's limited partnership interest is controlled by LTI, under the

pledge agreement; (4) debtors have not taken any substantive steps in furtherance of a

sale of SCCCC, LP; (5) the "put" provision of the limited partnership agreement may not

be funded; and (6) the debtors proposed plan does not contain any "backup" provisions if

the limited partnership is not sold within one year or the "put" provision is not

effectuated.

A.

I agree with LTI that a party proposing a chapter 11 plan that calls for the

sale of an asset typically will need to present some evidence of a bona fide offer or

26

competent marketing efforts to establish feasibility.  See generally In re Milford

Connecticut Associates, L.P., 404 B.R. 699, 702 (D. Conn. 2009); In re Kings Gate

Apartments, Ltd., 206 B.R. 233, 235 (Bankr. W.D. Okla. 1996); In re Calvanese, 169

B.R. 104, 107-08 (Bankr. E.D. Pa. 1994):

> In the clear majority of cases considering such or similar
> plans, bankruptcy courts have refused to confirm plans which
> keep creditors 'on hold' without receipt of payments while the
> debtor seeks to sell real estate which it has been unable to sell
> in years past.  Generally, these courts point out that such plans
> are nothing more than speculative ventures which place all the
> risk on the respective secured creditors, and, therefore, are not
> . . . feasible.

(citation omitted).

Nonetheless there have been decisions finding proposed plans feasible

without evidence of marketing efforts or a firm offer to purchase.  See, e.g., Matter of

T-H New Orleans Ltd. Partnership, 116 F.3d 790, 801-02 (5th Cir. 1997) (plan proposing

to repay secured creditor out of revenues, with a sale of collateral if in default, was

feasible without evidence of a sale offer or marketing efforts); In re Barnes, 309 B.R.

888, 895 (Bankr. N.D. Tex. 2004) (plan calling for future sale of assets was feasible when

those assets had been increasing in value).  The likelihood of a future sale can be

demonstrated by other evidence in certain circumstances.

Here, the debtors' expert, Mr. Redpath, and LTI's expert, Mr. King, agreed

that Verizon Wireless is likely to be interested in purchasing the limited partnership.  I

find their reasons (having to do largely with wireless coverage zones and the amount of

roaming revenue paid) persuasive.  And there is no suggestion from LTI that Verizon

Wireless could not obtain funds necessary for such purchase.  In addition, there is no

dispute that SCCCC, LP presently generates a significant amount of net annual income,

which income has been increasing substantially for the past few years, and which would make its business attractive to other entities.  Thus, from the evidence presented, I find it likely that the debtors could obtain a purchaser and sell the limited partnership within one year of confirmation.  See generally In re Barnes, 309 B.R. at 895; cf. In re Mid-Towne Associates, 36 F.3d 1097 (Table), 1994 WL 487347, at *3 (6th Cir. 1994) (plan proposing sale to prospective purchaser was feasible given the prospective purchaser's net worth and prior experience).

Evidence of the feasibility of a sale under this plan is also enhanced by the existence of the contractual "put" provision in the limited partnership agreement.  If there is no acceptable offer tendered within four months of the effective date, the debtors have committed to exercising the "put" option and sell their interests to SCCTC.  Cf. In re Mastel, 2010 WL 234971, at *5-*7 (Bankr. D. Mont. 2010) (equity in property and sale deadline in the proposed plan were sufficient to establish feasibility under section 1325(a)(6)).  Under the terms of the partnership agreement, unless a price of those interests is mutually acceptable, appraisal values establish the price SCCTC must pay.  And, as acknowledged by LTI, there is evidence that appraisals will justify a price that would support the debtors' plan commitments.

The procedure for exercise of the "put" provision is detailed in the limited partnership agreement.  Nevertheless, LTI complains that the debtors offered no evidence that SCCTC could afford to pay the necessary purchase price.  LTI is correct that the evidentiary record discloses that SCCTC owns no assets other than its interest in the limited partnership.  However, it also appears that SCCTC, which has been a limited partner for many years, never had any other assets.  It is a subsidiary entity, entirely

28

owned by U.S. Cellular, which in turn is controlled and 80% owned by TDS. And credible evidence was offered from an officer of TDS that U.S. Cellular would honor SCCTC's contractual commitment and could easily afford to do so.[13] Given the evidentiary standard for feasibility, this is sufficient to meet the debtors' burden of persuasion on this point. See In re Travelstead, 227 B.R. 638, 651-52 (D. Md. 1998).

The SCCTC "put" provision also renders it highly likely that SCCTC would support any third-party sale proposed by the debtors sufficient to meet the plan's obligation to repay LTI's secured claim in full. As a 49% limited partner, SCCTC is highly unlikely to object to the sale of the limited partnership because the proposed purchase price is too high. More plausible would be its objection that the sale price is too low. In the face of such an objection, however, SCCTC would find it difficult to argue that its "put" obligation should not be greater than 40.8% of the rejected purchase price (or 51% if SCTC's interest is included). Thus, if there is a third-party offer that fulfills the debtors' plan obligation to repay LTI's allowed claim in full, and is acceptable to the debtors, there is little chance that an SCCTC objection to the proposed sale would result in sale proceeds—either of the limited partnership or of the debtors' limited partnership interests—that would not fully compensate LTI's allowed claim.

Additionally, LTI raises the concern that the debtors would receive an offer to purchase the limited partnership within four months, but that no closing would occur within the one year period. Presumably, closing could fail because: the purchaser could

---

[13]Therefore, I do not consider whether U.S. Cellular would be liable for SCCTC's failure to act under an alter ego theory. See generally Taylor v. Standard Gas & Elec. Co., 306 U.S. 307 (1939); Albert v. Alex. Brown Management Services, Inc., 2005 WL 2130607, at *9 (Del. Ch. 2005).

not obtain the necessary funds or any requisite FCC approval; owing to actions taken by

SCCCC, LP to cause such failure; or a steep decline in SCCCC, LP revenues that would

constitute a material adverse change.

Given the expert evidence presented as to the likely third-party purchasers

(e.g., Verizon Wireless, TDS), the terms and length of the present roaming agreement

between SCCCC, LP and Verizon Wireless, and credible testimony from Ms. Copp that

she intends to act so as to maximize distributions to the equity members of the debtors, I

find LTI's fears on this point unfounded.  Ms. Copp would not act intentionally so as to

default under the terms of a confirmed plan, as such conduct could result under section

1112(b)(4)(M), (N) either in dismissal of the case (with LTI's potential recovery of the

debtors' partnership interests) or conversion to chapter 7 and a forced sale by a chapter 7

trustee.

Accordingly, I am persuaded that the credible evidence presented at the

confirmation hearing is sufficient to demonstrate that the debtors' jointly proposed

plan—calling for the sale of the limited partnership within one year, with the fall-back

position that if no viable offer to purchase is made within four months of the effective

date, SCCTC would be required to purchase the debtors' limited partnership interests—is

feasible in that there is a strong likelihood that a buyer could be found that would pay an

amount sufficient for the debtor to meet its plan funding obligation and/or that SCCTC,

through its parent entities, could fund its contractual "put" obligation that would also

yield adequate funds to repay creditors of the debtors in full.

In reaching this conclusion, I find the following four decisions relied upon

by LTI to the contrary to be distinguishable.

First, in <u>In re Walker</u>, 165 B.R. 994 (E.D. Va. 1994), the debtors' proposed

chapter 11 plan was summarized as follows:

> [T]he plan of reorganization: (1) does not obligate the debtors
> to make any payments to secured creditors for a period of four
> years; (2) does not provide a schedule for the liquidation of
> assets critical to the funding of the plan and consequently to
> its ability to achieve a result consistent with the requirements
> of the Bankruptcy Code; (3) allows the debtors virtually
> unfettered discretion in deciding when and how to market
> assets to be sold to provide funding for the plan and in
> determining the appropriate price to accept for the sale of
> those assets; and (4) permits the debtors to fund their house
> payment and living expenses in part from assets which may be
> necessary to fund the payments and, at the same time, imposes
> no definitive restrictions on the abundant, if not lavish,
> lifestyle of the debtors except to preclude them from
> expanding it to "an unreasonable degree."

<u>Id.</u>, at 1002.

In holding, <u>inter alia</u>, that this proposal was not feasible, the court in <u>Walker</u>

observed that the debtors had been attempting prepetition to sell various properties

without success, <u>id.</u>, at 996, and emphasized that the proposed chapter 11 plan had no

deadline to sell assets, nor even a commitment to sell assets sufficient to fund the plan:

> Without knowing the terms of the proposed sales of
> Midlothian Farm and the Portsmouth Blvd./Gum Road
> property, and without knowing the specific time frame for the
> proposed sale, and without articulation of a schedule and a
> plan for the liquidation of other properties in the event that the
> sale of the Midlothian Farm and the Portsmouth Blvd./Gum
> Road property fails to yield sufficient funding, it is impossible
> for a court to find that . . . [the requirement of section
> 1129(a)(11) has been proven].

<u>Id.</u>, at 1005.

In this contested matter, the time frame, the assets and the schedule of the

sale of assets have all been set forth in the proposed plan.  There has never been an

attempt prepetition to sell SCCCC, LP.  Moreover, a one-year deadline for sale has been

included.      Similarly, in In re Reading Broadcasting, Inc., 2009 Bankr. Lexis 2593

(Bankr. E.D. Pa. 2008), I confirmed a plan proposed by the chapter 11 trustee rather than

one proposed by a creditor, PTN, because the evidence reflected that PTN would need to

obtain a far greater loan to fund its proposed plan than it was likely to receive, given the

value of offered collateral:

> With this valuation, PTN would not receive sufficient funding
> from Wells Fargo to effectuate its proposed chapter 11 plan.
> Accordingly, without addressing any other objections, its plan
> proposal is not feasible and cannot be confirmed.  Indeed, no
> party in interest appearing at the confirmation hearing, besides
> PTN, concluded, after listening to all of the evidence, that
> there was sufficient likelihood that this creditor's plan would
> be effectuated.  Given that PTN's proposed plan offered a
> superior dividend to unsecured creditors, this absence of
> support at the hearing is relevant.

Id., at *39.  Here, the value of the debtors' interests in the limited partnership are

conceded to exceed the value of the claims asserted against them.  Therefore, as a sale is

likely, sufficient plan funding is also feasible.

In re D& G Investments of West Florida, Inc., 342 B.R. 882 (Bankr. M.D.

Fla. 2006), is also distinguishable in that the debtor's proposed plan was unlikely to be

funded from the debtor's income or financing, id., at 886, and the plan guarantor did not

agree to guarantee the balloon payment due under the proposed plan.  Id., at 887.  By

contrast, in this dispute to the extent one views the SCCTC "put" provision as similar to a

guarantee of plan funding if a sale does not occur, an adequate commitment to fund this

contractual commitment has been made.

Finally, LTI relies upon In re Hoffman, 52 B.R. 212 (Bankr. D.N.D. 1985).

The bankruptcy court concluded that a proposed chapter 11 plan calling for the sale of

real estate was not feasible.  Without detailing the evidence presented (or lack thereof),

the court concluded:

> [T]he Court is not satisfied that the proposed sale of the real
> estate as contemplated is sufficiently concrete to assure either
> consummation within the two years or that even if sold within
> the two-year period the price obtained would be sufficient to
> pay the principal balance and accrued interest owing to
> Federal Land Bank.  The Court must conclude that the
> requirement of 11 U.S.C. § 1129(a)(11) has not been met in
> this instance.

Id., at 215.

For the reasons stated above, I conclude that a sale proposed by the plan is

likely to occur within the time specified and that such a sale will be sufficient to repay

creditors claims in full.


B.


LTI raises an additional feasibility argument that is counterintuitive to its

overall position that the debtors do not intend to sell the limited partnership and that all of

the risk of delay falls upon LTI.

LTI contends (and the debtors may not disagree) that all of the limited

partners must approve the sale of SCCCC, LP under Delaware law, which law governs

the partnership agreement, exs. D-2; LTI-1 (tab 3A, 3B), and which agreement is being

assumed under the proposed plan.  See generally Cincinnati Bell Cellular Systems Co. v.

<u>Ameritech Mobile Phone Service of Cincinnati, Inc.</u>, 1996 WL 506906 (Del. Ch. 1996).[14]

SCTC, which holds a 10.2% limited partnership interest, has not consented to the sale proposed by the debtors' joint plan, according to LTI, because SCTC's partnership interest is now controlled by LTI under the terms of the pledge agreement and the written notice of default provided by LTI in January 2009.  Thus, LTI contends that SCTC's approval of the joint proposed plan, signed by Ms. Copp, is a nullity; and without such approval, no partnership sale can take place as proposed by the joint plan.[15]

In other words, although LTI contends that the debtors' plan should not be confirmed because a sale that would repay this creditor's secured claim in full is not sufficiently likely to occur, and because any sale delay imposes a great risk of non-

---

[14]There are a number of partnership issues implicated by this proposed plan that were not raised by the parties and so I need not consider.

For example, paragraph 7.1(k) of the limited partnership agreement lists among the powers of the general partner the ability "[t]o sell, exchange or otherwise dispose of Partnership assets in the ordinary course of business."  Does the general partner, SCCI, thus have the right to sell the limited partnership without the consent of all the limited partners?  Would any dispute over the general partner's right to sell fall within the arbitration clause provision of the partnership agreement, paragraph 12.4?  <u>See</u> generally, <u>James & Jackson, LLC v. Willie Gary, LLC</u>, 906 A.2d 76 (Del. 2006).  Furthermore, does the bankruptcy filing of the general partner, SCCI, or of the limited partner, SCCE, have any effect upon their limited partnership interests or upon the limited partnership, or upon the debtor limited liability companies as a matter of state law?  <u>See</u> 6 Del.C. §§ 17-402(4)(b); 17-801(3).  If so, is such state law invalidated on these points by federal bankruptcy law, <u>viz.</u>, section 365?  <u>See</u> generally <u>Milford Power Co., LLC v. PDC Milford Power, LLC</u>, 866 A.2d 738 (Del. Ch. 2004); 6 <u>Norton Bankruptcy Law and Practice 3d</u>, § 120:2 (2009).  Moreover, if state law were not invalidated, do the post-bankruptcy actions of the limited partners, or the votes in favor of the debtors' joint plan by the equity members, constitute a form of waiver of those state law provisions?  <u>See</u> generally <u>In re Woskob</u>, 305 F.3d 177 (3d Cir. 2002).

[15]LTI's position that it had already "foreclosed" upon the SCTC's limited partnership interest, would, if correct, result in the amount of their asserted claim being reduced by 10.2% of the value of SCCCC, LP.  If so, the amount needed by the debtors to repay LTI's claim under their proposed plan would be substantially reduced.  That is, if the enterprise value of SCCCC, LP exceeds $52 million, as opined by Mr. Redpath, LTI's secured claim would be reduced by more than $5 million.

payment upon LTI, it also argues that the plan should not be approved because LTI intends to block such a sale via its control over SCTC's limited partnership interest. The debtors counter that LTI does not control SCTC's interest in the limited partnership. Alternatively, the debtors seek an injunction in their plan to preclude LTI from so doing.

The issue of LTI's rights vis-a-vis SCTC's limited partnership interest is presently being considered in the Colorado state court system. The debtors emphasize that LTI had previously stated in these bankruptcy cases that it would take no actions to control SCTC (and the debtors) when LTI moved to dismiss these chapter 11 cases under section 1112(b). LTI argued (unsuccessfully) that dismissal would not harm the debtors because it would assert no rights provided by the three pledge agreements until the Colorado litigation had determined that LTI held those rights, and so the debtors could raise all challenges to LTI's claim in the state court litigation. See In re South Canaan Cellular Investments, Inc., 2009 WL 2922959, at *10 (Bankr. E.D. Pa. 2009), aff'd, 2009 WL 3682338 (E.D. Pa. 2009). Therefore, the debtors maintain that LTI has acknowledged that SCTC's partnership interest had not been transferred prepetition. In addition, LTI has not taken any action in these bankruptcy cases in the name of SCTC.

The debtors' implicit contention is that LTI should be judicially estopped from controlling SCTC's limited partnership interest, based upon its earlier argument that it would not do so until given approval in the Colorado litigation, even though LTI's dismissal motions were ultimately denied. The concept of judicial estoppel, in general, is designed to protect the integrity of the judicial process by "preclud[ing] a party from asserting a position in one legal proceeding which is contrary to a position it has already asserted in another." Patriot Cinemas, Inc. v. General Cinemas Corp., 834 F.2d 208, 212

(1st Cir. 1987); see, e.g., Scarano v. Central R. Co. of N. J., 203 F.2d 510, 512-13 (3d Cir.

1953).  The Third Circuit recently provided instructions as to the proper application of

this doctrine:

> Though there is no rigid test for judicial estoppel, three
> factors inform a federal court's decision whether to apply it:
> there must be (1) "irreconcilably inconsistent positions;" (2)
> "adopted ... in bad faith;" and (3) "a showing that ... estoppel
> ... address[es] the harm and ... no lesser sanction [is]
> sufficient." Chao v. Roy's Constr., Inc., 517 F.3d 180, 186 n.
> 5 (3d Cir.2008) (internal quotation marks omitted).  We do
> not consider these factors, however, because, in our Circuit
> judicial estoppel is generally not appropriate where the
> defending party did not convince the District Court to accept
> its earlier position.
>                              ***
> We do not mean to suggest that where no court has accepted
> an initial position, judicial estoppel can never apply. We will
> apply it to neutralize threats to judicial integrity however they
> may arise.  For example, in Krystal Cadillac-Oldsmobile
> GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314 (3d
> Cir. 2003), a bankruptcy case, we applied judicial estoppel
> even though no court had ever relied on the debtor's initial
> position.  Id. at 320-21.  We did so because creditors almost
> certainly had relied on it, undermining the bankruptcy process
> by weakening their bargaining position.  Id. at 324-25.

G-I Holdings, Inc. v. Reliance Insurance Co., 586 F.3d 247, 262,  (3d Cir. 2009) (citations

omitted).

Before I consider this estoppel argument, I shall consider the debtors'

contractual contention.


C.


Alternative to their estoppel argument, the debtors contend that any valid

assumption of SCTC's partnership interest would, by virtue of the SCTC pledge

36

agreement, require that LTI first obtain the approval of the Federal Communications

Commission.  <u>See</u> Debtors' Memorandum, at 55 n.11; Debtors' Supplemental

Memorandum, at 7-8.  There was no evidence presented that LTI has sought or obtained

FCC approval.  Nevertheless, for the following reasons I disagree that FCC approval is

required by LTI to control SCTC's limited partnership interest.

      Section 6 of the SCTC Partnership Interests Pledge Agreement, ex. LTI-1

(tab 5C), states that, after a default, "Secured Party shall thereupon have, in addition to all

other rights provided herein and in the loan documents subject to any necessary approval

of the FCC, the rights and remedies of a secured party under the UCC . . . ."  Section 3(E)

of the pledge permits the Secured Party to exercise its rights under Section 6 without

seeking the consent or approval "of any person or entity (other than the FCC). . . ."

Section 4 of this pledge document, provides that, in the absence of a default, the pledgor

shall have the right to exercise all voting powers of ownership.  It further states that

> Upon the occurrence and during the continuance of an Event
> of Default, and <u>subject to the provisions of Section 13 of this
> Pledge Agreement</u>, all rights of Pledgor to exercise its voting,
> consensual and other powers of ownership pertaining to the
> Collateral shall become vested in Secured Party upon two
> day's prior written notice from Secured Party to Pledgor and
> the Pledged Partnership, and thereupon Secured Party shall
> have the sole and exclusive authority to exercise such voting
> . . . .

(emphasis added).

      Section 13 of the Pledge Agreement is styled "FCC Matters."  Subsection

(A) of that section states that:

> Any foreclosure on, sale, transfer or other disposition of, or
> the exercise or relinquishment of any right to vote or consent
> with respect to, any of the Collateral by the Secured Party
> shall, <u>to the extent required</u>, be pursuant to Section 310(d) of

37

> the Communications Act of 1934, as amended, and the
> applicable rules and regulations thereunder, and, <u>if and to the
> extent required thereby</u>, subject to the prior approval or notice
> to and non-opposition of the FCC.

(emphasis added).

> Section 310(d) of the above referenced Communications Act provides:
> No construction permit or station license, or any rights
> thereunder, shall be transferred, assigned, or disposed of in
> any manner, voluntarily or involuntarily, directly or indirectly,
> or by transfer of control of any corporation holding such
> permit or license, to any person except upon application to the
> Commission and upon finding by the Commission that the
> public interest, convenience, and necessity will be served
> thereby.  Any such application shall be disposed of as if the
> proposed transferee or assignee were making application
> under section 308 for the permit or license in question; but in
> acting thereon the Commission may not consider whether the
> public interest, convenience, and necessity might be served by
> the transfer, assignment, or disposal of the permit or license to
> a person other than the proposed transferee or assignee.

47 U.S.C. § 310(d).

The debtors maintain that LTI's exercise of SCTC's pledge of its

partnership interest, which interest, <u>inter alia</u>, can prevent a sale of the limited partnership

owing to a lack of unanimity, is a sufficient transfer of control of, or rights to the license

held by, SCCCC, LP as to require FCC approval.  Debtors' Supplemental Memorandum,

at 8.

The purpose of section 310(d) is to prohibit the transfer of a controlling

interest in an entity holding an FCC license, such as SCCCC, LP, without FCC approval.

<u>See</u> <u>generally</u> <u>Kay v. F.C.C.</u>, 396 F.3d 1184, 1186 (D.C. Cir. 2005); <u>Astroline</u>

<u>Communications Co. Ltd. Partnership v. F.C.C.</u>, 857 F.2d 1556, 1563 (D.C. Cir. 1988).

The language of the pledge agreements refers to the need for the lender to obtain FCC

approval, but only if necessary or required.  <u>See</u> <u>In re Uno Broadcasting Corp.</u>, 167 B.R.

38

189, 195 (Bankr. D. Ariz. 1994).  It is likely that CoBank demanded the SCTC pledge

agreement, even though SCTC was not an obligor on the promissory note, ex. LTI-1 (tab

4C), so that, upon a loan default by the debtors, it could obtain a 51% interest in the

limited partnership (the interests of SCCE, SCCI and SCTC equal 51%) and thereby

exercise control of its operations.  Since SCTC had no repayment obligations to CoBank,

the parties anticipated that the three stock pledge agreements regarding the limited

partnership interests would be exercised simultaneously.  In that event, some form of FCC

approval probably would be required before the lender, or its assignee, could obtain

control over SCCCC, LP and its license.  See Storer Communications, Inc. v. F.C.C., 763

F.2d 436, 439-40 (D.C. Cir. 1985) (substantial change in board of directors of corporation

that controlled a license required FCC approval); In re Turner Broadcasting System, Inc.

for Declaratory Ruling, 101 F.C.C.2d 843, 1985 WL 260411 (F.C.C., 1985).  Here,

though, because of the bankruptcy stay of section 362(a), LTI has not foreclosed upon

and does not assert that it controls the debtors' partnership interests.

     Although the statute does not define the term "control" for purposes of

section 310(d) of the Act, and the FCC renders such a determination on a case-by-case

basis, see In re Petition of Turner Broadcasting System, Inc., 1985 WL 260411, at *5, I

believe it is unlikely that the FCC would consider the transfer of only a minority (10.2%)

limited partnership interest (with the partnership as licensee) as requiring its approval,

where management of the partnership did not change.  See generally In Re Tender Offers

and Proxy Contests, 1986 WL 291498, at *4 (F.C.C., 1986).

     I note that the SCTC pledge agreement was to be governed by Colorado

state law (unless federal law was germane), ex. LTI-1 (tab 5C, § 9(H)); and Colorado

common law provides that parties' intent is determined by the express terms of the

agreement.  <u>See</u>, <u>e.g.</u>, <u>Pepcol Manufacturing Co. v. Denver Union Corp.</u>, 687 P.2d 1310,

1313-14 (Colo. 1984);  <u>Moland v. Industrial Claim Appeals Office of State</u>, 111 P.3d 507,

510 (Colo. App. 2004).  As the agreement permitted the assumption of SCTC's

partnership interest upon loan default and after 48 hours written notice, and as federal law

does not require FCC approval of such a transfer of this partnership interest, to the extent

that LTI holds a valid assignment of the SCTC pledge—an issue pending before the

Colorado state court—it controls SCTC's voting interest in the limited partnership.


V.


Presumably to prevent LTI from gaining control of SCTC's voting interest

in the limited partnership, paragraph 10.7 of the jointly proposed plan provides for an

injunction against LTI and in favor of SCTC.  This injunction would preclude LTI from

prosecuting the Colorado state court litigation or otherwise foreclosing upon SCTC's

partnership interest.  The proposed injunction would terminate upon the earlier of the

debtors' default under a confirmed plan or 18 months after the effective date.

LTI challenges this injunction as "illegal" and therefore violative of

sections 1129(a)(2) and (b)(1).  LTI Memorandum, at 38.  The debtors counter that this

injunction is both permissible and necessary to accomplish their proposed reorganization.

Debtors' Memorandum, at 45.  In addition to fostering the proposed sale of SCCCC, LP,

they argue that the injunction would alleviate the burden on Ms. Copp, who is being

forced to devote some of her time and services to the Colorado litigation in a remote

40

venue.  The debtors also raise the concern that a judgment in the SCTC litigation may

have preclusive effect upon their litigation with LTI in this forum.  Debtors'

Memorandum at 46.

In deciding whether the debtors have demonstrated a right to enjoin LTI

from proceeding against SCTC, I note that the purpose of the injunction has some

relationship to the debtors' earlier judicial estoppel argument.[16]  I also note that the pledge

agreement, as well as Delaware law, acknowledges a distinction between the right of the

limited partner to receive partnership distributions and the right to vote on partnership

issues.  See generally Hillman v. Hillman, 910 A.2d 262, 274-75 (Del. Ch. 2006)

(recognizing a difference between a partner's "economic rights" and "voting rights," with

the former typically being "freely assignable to a third party.").

In support of their proposed third-party injunction, the debtors cite to the

analysis found in In re Philadelphia Newspapers, LLC, 407 B.R. 606 (E.D. Pa. 2009).  In

Philadelphia Newspapers, the District Court, relying extensively upon a discussion in

McCartney v. Integra National Bank North, 106 F.3d 506, 510 (3d Cir. 1997), concluded

that section 105(a) of the Bankruptcy Code empowers the issuance of such an injunction

outside of the plan confirmation process when the claims of the creditor against the third

party fall within the subject matter jurisdiction of the bankruptcy court, id., at 611, and

when "unusual circumstances" exist.  Id., at 616.  "Such unusual circumstances may be

found, at least, where: (i) the non-debtor and debtor enjoy such an identity of interests that

---

[16]The injunction proposed by ¶ 10.7 of the joint plan does not appear to enjoin LTI
from exercising those SCTC partnership rights it already has.  This is consistent with the debtors'
position that LTI does not currently hold those rights.  LTI's challenge to the proposed injunction
may not be consistent with its present assertion that it need not obtain a declaratory judgment
from the Colorado state court.

the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party

action will have an adverse impact on the debtor's ability to accomplish reorganization."

Id., at 616.  See also In re Philadelphia Newspapers, LLC, 2010 WL 94564, at *4 (E.D.

Pa. Jan. 11, 2010).

Although the Third Circuit did not expressly endorse third-party injunctions

under those two circumstances in McCartney, see Stanford v. Foamex L.P., 2009 WL

1033607, *1 (E.D. Pa. 2009), most courts have accepted that, in appropriately limited

circumstances, injunctions in favor of non-debtors may be issued.  See, e.g., In re Saxby's

Coffee Worldwide, LLC, 2009 WL 4730238, at *5 (Bankr. E.D. Pa. 2009); 1 Norton

Bankr. Law & Practice 3d § 13:6 (2010).

In the context of confirmation of a chapter 11 plan and non-debtor releases,

the Seventh Circuit Court of Appeals has held recently that section 1123(b)(6)[17], in

addition to section 105(a), provides statutory authority for third-party relief in appropriate

circumstances.  In re Airadigm Communications, Inc., 519 F.3d 640, 657 (7th Cir. 2008)

(upholding a release in favor of TDS).  The Sixth Circuit has also relied upon section

1123(b)(6) to uphold a plan provision that provided a third-party injunction.  In re Dow

Corning Corp., 280 F.3d 648, 656-57 (6th Cir. 2002); see also In re Brotby, 303 B.R. 177,

190 (B.A.P. 9th Cir. 2003) (upon proper circumstances, a creditor holding a non-

---

[17]The subsection provides:

(b) Subject to subsection (a) of this section, a plan may--
                                    ***
(6) include any other appropriate provision not inconsistent with
the applicable provisions of this title.

dischargeable claim may be temporarily enjoined from collection efforts); In re MAC

Panel, 2000 WL 33682394, at *6 (M.D.N.C. 2000):

> The issuance of a third party injunction or release depends
> upon the contents of the plan and other attendant
> circumstances.  The courts issuing such injunctions and
> releases have identified a number of factors that are important
> in deciding whether an injunction and/or release should be
> issued.  These factors include (1) whether the third party who
> will be protected by the injunction or release has made an
> important contribution to the reorganization; (2) whether the
> requested injunctive relief or release is "essential" to the
> confirmation of the plan; (3) whether a large majority of the
> creditors in the case have approved the plan; (4) whether there
> is a close connection between the case against the third party
> and the case against the debtor; and (5) whether the plan
> provides for payment of substantially all of the claims
> affected by the injunction or release.

In their jointly proposed plan, the debtors have attempted to provide in

paragraphs 10.7 and 12.5 that any improper injunctive provision can be excised by this

court, were the plan otherwise confirmable.  Moreover, in In re Walker, 165 B.R. 994,

1000 (E.D. Va. 1994),[18] the district court upheld the power of a bankruptcy court to

condition confirmation upon the inclusion of necessary plan terms in limited

circumstances.  See also In re T-H New Orleans Ltd. Partnership, 188 B.R. 799, 809

(E.D. La. 1995) ("[A] bankruptcy court may condition confirmation on a modification

that would address a narrowly tailored objection of the confirmation hearing without

requiring a new hearing.").

Applying the appropriate standard set out above, I find that an injunction

against LTI and in favor of SCTC that is limited solely to permit the sale proposed by the

debtors in their joint plan and seemingly desired by LTI is warranted in these

_____

[18]A decision relied upon by LTI for its feasibility analysis.

circumstances, given the objections raised.  Not only would such an injunction be

essential to any chapter 11 reorganization and be intended to promote the repayment of

allowed claims in full, see 1 N.T. at 90-91 (dispute over the right to vote SCTC's interest

would affect sale of SCCCC, LP), but it would address the inconsistency in LTI's

objections to confirmation and its position taken earlier in these cases—that it would not

exercise any of SCTC's partnership rights until the Colorado state court confirmed it held

those rights, and more importantly, that it desires a prompt sale of the limited partnership

at a price that would repay its allowed secured claim in full.  See generally Krystal

Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314 (3d Cir.

2003).  If it presently has control of SCTC's voting rights (an issue I leave to the

Colorado state court to decide), to permit LTI, through its control of SCTC's voting

rights, to veto a sale of the limited partnership that is consistent with the proposed plan

and is consistent with its demand for such a sale, and where that vetoed sale would have

repaid its allowed claim in full, would imply that LTI is seeking to acquire the excess

value in the limited partnership, and thus is not acting in good faith.

      In so concluding, however, I also find that the debtors' proposal to enjoin

LTI for 18 months and to enjoin prosecution of the Colorado litigation is not warranted in

these circumstances.

      First, the legal issues posed by the state court litigation do not involve

federal bankruptcy law, the state court litigation was filed first, and venue in Colorado

was agreed upon as part of the CoBank loan documents.  SCTC's position in the

Colorado litigation is fully represented, and apparently by some of the same attorneys as

are representing the debtors in their bankruptcy litigation involving LTI.  Ms. Copp is the

individual acting for SCTC in that litigation, and her time would be spent, in part, on oveseeing that litigation.  But she instead proposes spending some of her time on the Coughlin/LTI litigation pending in this court.  Even if the outcome of the Colorado litigation could give rise to collateral estoppel in litigation in this forum, the debtors do not articulate a persuasive reason why an injunction, essentially forcing the parties to litigate in this court, is appropriate or necessary for reorganization.

Second, there is no basis to enjoin LTI for 18 months after the effective date of a confirmed plan, given that the proposed plan calls for a sale within one year of the effective date.

Third, the debtors fail to justify an injunction that would preclude LTI (if it does not already have it) from obtaining SCTC's economic distribution rights from SCCCC, LP.  As previously noted, SCTC promised to use such distributions to repay LTI.  Thus, any recovery by LTI would neither be harmful to the debtors nor affect their ability to consummate their proposed plan.

Conversely, an injunction that only would preclude LTI from exercising SCTC's voting rights in the limited partnership could conceivably affect the assets distributed in these chapter 11 cases—by vetoing a sale of the limited partnership—and would therefore fall within this court's "related to" subject matter jurisdiction.  See, e.g., In re Philadelphia Newspapers, LLC, 407 B.R. at 614-15.

I am also persuaded that a limited injunction precluding LTI from obtaining (if it does not already have them) or exercising the voting interests of SCTC for a 12 month period may be essential to the sale of SCCCC, LP, and thus to the success of a plan that proposes full payment to LTI, other creditors, with a residual distribution to equity

members.  Accordingly, to the extent that the debtors' jointly proposed plan is otherwise

confirmable, I shall modify the injunctive provisions of the plan as set forth above and not

deny confirmation on that basis.

　　　　　For these reasons, the various issues raised by LTI concerning SCTC do not

by themselves preclude confirmation of the proposed chapter 11 plan as either being

infeasible or not fair and equitable or in violation of the Bankruptcy Code.


                                    VI.


　　　　　Implicitly raised by LTI is the requirement found in section 1129(a)(3) that,

for purposes of confirmation, this joint plan must be proposed in "good faith and not by

any means forbidden by law."  Recognizing that "good faith" under section 1129(a)(3) is

not defined, the Third Circuit has adopted the Seventh Circuit's definition:

> ("[F]or purposes of determining good faith under section
> 1129(a)(3) . . . the important point of inquiry is the plan itself
> and whether such a plan will fairly achieve a result consistent
> with the objectives and purposes of the Bankruptcy Code.").
> The purpose of requiring such a finding in each situation,
> however, is quite similar: it prevents a debtor-in-possession or
> trustee from effectively abrogating the creditor protections of
> Chapter 11.

In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 n.5 (3d Cir. 1986) (quoting

Matter of Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir.1984)); see In re

Combustion Engineering, Inc., 391 F.3d 190, 247 (3d Cir. 2004); In re PWS Holding

Corp.,228 F.3d 224, 242 (3d Cir. 2000).  Recently, a former colleague rephrased this

statutory requirement thusly:

                                    46

> Stated another way, "'[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of 1129(a)(3) is satisfied.'" Matter of T-H New Orleans Ltd. Partnership, 116 F.3d 790, 802 (5th Cir.1997) (quoting In re Sun Country Dev. Inc., 764 F.2d 406, 408 (5th Cir.1985)). A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design and indeed may not be confirmable. Matter of Briscoe Enterprises, Ltd., II, 994 F.2d 1160, 1167 (5th Cir.1993). Bad faith, on the other hand, has been found where there is no realistic possibility of reorganization and the debtor seeks merely to frustrate efforts of secured creditors. United Marine, 197 B.R. at 947 (citing In re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir. 1984)).

In re Frascella Enterprises, Inc., 360 B.R. 435, 446 (Bankr. E.D. Pa. 2007).

In applying section 1129(a)(3), "[t]he requisite good faith determination is based on the totality of the circumstances." In re Sylmar Plaza, L.P., 314 F.3d 1070, 1074 (9th Cir. 2002).

The debtors in this contested matter maintain that their proposed plan, which would pay all creditors in full, including LTI, while also resulting in a distribution to its equity members, is designed to maximize the value of the debtors' interests in the limited partnership through a sale of the limited partnership as a going concern. Preserving a going concern, or maximizing the value of the debtor's estate are valid bankruptcy purposes. See, e.g., In re Integrated Telecom Express, Inc., 384 F.3d 108, 119-20 (3d Cir. 2004). Therefore, the debtors argue that the requirement of section 1129(a)(3) has been met. See In re General Teamsters, Warehousemen and Helpers Union, Local 890, 265 F.3d 869, 877 (9th Cir. 2001). LTI maintains that the joint plan is proposed solely for purposes of delay.

For reasons stated above, I have found that the debtors' proposed joint plan is feasible and is intended to preserve value to their members. In so doing, I have addressed the concerns implicated by section 1129(a)(3). Moreover, I conclude that the debtors intend to effectuate the plan terms if confirmed, and that the plan is not proposed solely to delay recovery by LTI. Accordingly, I find that the joint plan under consideration was indeed proposed in good faith and not by any means forbidden by law.

VII.

In addition to its various objections regarding feasibility, LTI strongly maintains that the debtors' jointly proposed plan is not "fair and equitable" under section 1129(b)(1), (2). It contends that the proposed plan: forces LTI to bear all the risk of non-performance; does not expressly provide for retention of LTI's liens on the proceeds of its collateral; does not provide LTI with requisite interest on its secured claim; attempts to comply with section 1129(a)(10) by artificially impairing the claim of Bauknight; contains an improper exculpation provision; and permits Ms. Copp to retain conflicting roles with the debtors and the limited partnership. LTI's Memorandum at 22-37.

LTI holds the only claim in class 1, and has voted against the debtors' jointly proposed chapter 11 plan. "For a plan to be approved, either (1) each impaired class must accept the plan, or (2) the bankruptcy court must approve the plan as 'fair and equitable' despite a class's disapproval. 11 U.S.C. § 1129(b)." LaSala v. Bordier et Cie, 519 F.3d 121, 133 n.16 (3d Cir. 2008). As further explained by the Third Circuit Court of Appeals:

> Confirmation of a proposed Chapter 11 reorganization plan is governed by 11 U.S.C. § 1129. A court will confirm a plan if it meets all of the requirements set out in section 1129(a). Only one of these requirements concerns us in this appeal, and that is the requirement that the plan be consensual, with unanimous acceptance by all of the impaired classes. 11 U.S.C. § 1129(a)(8). If the plan is not consensual, a court may still confirm as long as the plan meets the other requirements of section 1129(a), and "does not discriminate unfairly, and is fair and equitable" as to any dissenting impaired class. 11 U.S.C. § 1129(b)(1); see Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 441, 119 S. Ct. 1411, 143 L. Ed.2d 607 (1999) [hereinafter LaSalle ]. The latter type of confirmation is also called a "cram down," as the court can cram a plan down over the objection of an impaired class. See generally Kenneth N. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133 (1979).

In re Armstrong World Industries, Inc., 432 F.3d 507, 511-12 (3d Cir. 2005).

Because LTI holds a secured claim, the provisions of section 1129(b)(2)(A) are germane. Those provisions were recently summarized as follows:

> To be fair and equitable with respect to a dissenting class, a plan must "include" certain requirements. 11 U.S.C. § 1129(b)(2)(A). Three minimum alternatives are provided for secured creditors. Under the first alternative, the holders may retain their liens accompanied by the right to receive deferred cash payments having a present value equal to the value of the collateral. 11 U.S.C. § 1129(b)(2)(A)(i) ("Clause (i)"). Second, the secured property may be sold free and clear of liens, with the liens attaching to the proceeds, as long as the creditor has the right to credit bid pursuant to 11 U.S.C. § 363(k). 11 U.S.C. § 1129(b)(2)(A)(ii) ("Clause (ii)"). Third, the plan may allow for the "realization by such holders of the indubitable equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A)(iii) ("Clause (iii)").

In re Pacific Lumber Co., 584 F.3d 229, 245 (5th Cir. 2009); see, e.g., In re Philadelphia Newspapers, LLC, 2010 WL 1006647, at *4-*5 (3d Cir. 2010).

49

A.

Here, the debtors contend that their jointly proposed plan meets the
requirements either of section 1129(b)(2)(A)(i) or (iii): LTI is retaining its liens on the
debtors' partnership interests and will receive a deferred lump sum payment equal to the
present value of its collateral upon the sale of the limited partnership, or the sale of the
debtors' partnership interests to SCCTC, and the allowance of LTI's secured claim.[19]  See
generally In re Philadelphia Newspapers, LLC, 2010 WL 1006647 (3d Cir. 2010). LTI
disagrees for a number of reasons.

First, paragraph 6.1(c) of the proposed plan states that "LTI shall retain all
of its liens and security interests . . . to the extent of its Allowed Claim.  In no event shall
the proceeds of collateral securing the LTI claim be used to pay any Allowed Claim until
LTI's Allowed Claim is paid in full other than to pay LTI interest as set forth below."
LTI maintains that this provision does not expressly provide that its security interest shall
attach to the proceeds of sale; nor does it provide for the safeguarding of those proceeds.

 Given the language in the debtors' amended disclosure statement and plan,
I do not construe this plan provision as providing for the dissolution of LTI's lien on the
debtors' interest in sale proceeds.  See In re Wonder Corp. of America, 70 B.R. 1018,
1020 (Bankr. D. Conn. 1987) ("Although "effective date" is not specifically defined in
the Plan, it is apparent from the definition contained in the Amended Disclosure
Statement, which accompanied the Plan, that the "Payment Date" is the effective date of

---

[19]As LTI has no security interest on the assets of SCCCC, LP, it does not argue
any entitlement to credit bid under section 363(k) when the limited partnership is sold.

the Plan and that the Banks are to be paid on that date."). <u>Compare</u> <u>Corestates Bank,</u>

<u>N.A. v. United Chemical Technologies, Inc.</u>, 202 B.R. 33, 53 (E.D. Pa. 1996) (plan

proposed to dissolve liens).  That issue can easily be clarified in a confirmation order.

Similarly, as to LTI's concern for protection of sale proceeds, such

protection may also be clarified in any order of confirmation if the requirements of

section 1129(b) are otherwise established.

The provision of the plan delaying the effective date until all appeals from

the confirmation order are concluded is also not a basis to deny confirmation as being

unfair or inequitable.  <u>See</u> <u>In re Wonder Corp. of America</u>, 70 B.R. at 1021:

> The Banks further argue that by tying the effective date to the
> finality of the confirmation order, their collateral may erode,
> perhaps to levels below the allowed amount of their claims,
> before payment is received.  Since, however, it is apparent
> that any procedural delay will most likely be instituted by the
> Banks themselves, that argument is unpersuasive as nothing
> more than a self-fulfilling prophecy whereby any appeal they
> file will delay the proposed payment and cause the interest on
> their secured claims to increase, thereby jeopardizing their
> right to full payment.  This concern could be minimized if not
> completely avoided, since if the Banks do not create a delay,
> the effective date need be no later than 30 days after the entry
> of the Confirmation Order, at which time the Plan provides
> for the full cash payment of their allowed claim.

(footnote omitted).

Nor is the plan provision that LTI's claim will be repaid only after

allowance unfair or inequitable, so long as all sale proceeds are protected from use by the

debtors.

B.

LTI further argues that the debtors' jointly proposed plan does not propose to pay its oversecured claim at its present value, because it provided for postpetition interest only from the effective date of the plan.  See, e.g., In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 205 n.14 (3d Cir. 2003) ("An impaired creditor in a solvent debtor case can demand postpetition interest under the 'fair and equitable' test of § 1129(b)(2).").  LTI's position is well-taken.  In response, however, the debtors have agreed to correct this defect by stating in their post-hearing memorandum that they will amended paragraph 2.30 of the proposed plan as follows:

> "LTI's Allowed Claim" means the amount of LTI's Claim that has been allowed by order of this Court, plus interest accrued from the Petition Date through the Effective Date at the rate of interest decided by the Bankruptcy court in connection with the Adversary Proceeding.

See generally 11 U.S.C. § 1127(a) (permitting pre-confirmation amendments).

As observed by the Second Circuit Court of Appeals, there are three relevant periods to consider when a secured creditor demands interest on its claim: prepetition; between commencement and the effective date of a plan; and post-effective date.  In re Milham, 141 F.3d 420, 422-23 (2d Cir. 1998).  Clearly, the provisions of a contract govern the allowance of interest during the period prepetition.  Id., at 423.[20]

---

[20]The debtors, in their objection to LTI's proof of claim, assert that contract interest was waived by LTI's assignor, CoBank.  At least one court has upheld a partial waiver of prepetition contract interest against an assignee.  In re Nixon, 400 B.R. 27, 35 (Bankr. E.D. Pa. 2008).

During the postpetition, pre-effective date period, most courts will award interest under section 506(b) at the contract rate to an oversecured creditor, which interest may include a default rate.  See Matter of Southland Corp., 160 F.3d 1054 (5th Cir. 1998); In re Nixon, 400 B.R. 27 (Bankr. E.D. Pa. 2008); 3 Norton Bankr. Law & Practice 3d, § 52:11 (2010); but see In re Milham, 141 F.3d at 423 ("Most courts have awarded pendency interest at the contractual rate; but nevertheless, however widespread this practice may be, it [section 506(b)] does not reflect an entitlement to interest at the contractual rate.").

Although the debtors do not expressly so state, I assume that they have declined to define a particular postpetition, pre-effective date interest rate under section 506(b) in light of their objection to LTI's proof of claim, which expressly includes a challenge to the application of the default interest rate.  Because the jointly proposed plan provides that no plan distributions will be made before LTI's allowed claim is paid, and LTI will not receive any payment until the objection to its claim is determined, deferring a determination of the prepetition as well as the postpetition, pre-effective date interest rates until allowance of its claim does not prejudice LTI and is not unfair or inequitable.

During the post-effective date period, section 1129(b)(2)(A) refers to an interest rate that results in payment of the present value of the secured claim.  The debtors further propose to pay LTI's claim at a 6% interest rate post-effective date.  LTI argues that this rate is below contract rate and below the risk of non-payment.

In Till v. SCS Credit Corp. 541 U.S. 465, 479-80 (2004), the Supreme Court held that the "prime-plus or formula rate best comports with the purposes of the Bankruptcy Code" in determining the cram-down interest rate owed to secured creditors,

post-effective date, under section 1325(a)(5).  Under this formula, a bankruptcy court

must first consider the current prime interest rate and adjust that rate upwards to

compensate the secured creditor for the appropriate risk of non-payment under the

confirmed plan.  Moreover, the Court, citing In re Valenti, 105 F.3d 55, 64 (2d Cir. 1997)

(abrogated on other grounds by Associates Commercial Corp. v. Rash, 520 U.S. 953

(1997)), observed that the typical risk premium was 1% to 3% above the prime rate.  Id.,

541 U.S. at 480.

Although Till was applying a chapter 13 cramdown provision, section

1325(a)(5), the similarity between that provision and section 1129(b)(2)(A)(i) strongly

suggests that the "prime-plus" formula  is also applicable to chapter 11 plans.  See, e.g.,

In re Orchards Village Investments, LLC, 2010 WL 143706, at *19 (Bankr. D. Or. 2010);

6 Norton Bankr. Law & Practice 3d, § 113:14 (2010).

The Sixth Circuit Court of Appeals has concluded that use of the "prime-

plus" approach is less desirable when an efficient market exists[21] for loans similar to the

funding proposal made by the chapter 11 debtor in its proposed treatment of the objecting

secured creditor.  In re American HomePatient, Inc., 420 F.3d 559, 568 (6th Cir. 2005).

If such market exists, the use of that market rate would be superior to that of the Till,

"prime-plus" rate.  Id.; see also In re American Trailer and Storage, Inc., 419 B.R. 412,

438 (Bankr. W.D. Mo. 2009); In re Prussia Associates, 322 B.R. 572, 588-89 (Bankr.

---

[21]Determination of whether that market exists requires evidence of loans similar in time of repayment, amount to be repaid, quality of collateral, and risk of repayment owing to the financial condition of the borrower. See In re Northwest Timberline Enterprises, Inc., 348 B.R. 412, 434 (Bankr. N.D. Tex. 2006); In re One Times Square Assocs. Ltd. Partnership, 159 B.R. 695, 706 (Bankr. S.D.N.Y. 1993), aff'd, 165 B.R. 773 (S.D.N.Y. 1994), aff'd, 41 F.3d 1502 (2d Cir.1994), cert. denied, 513 U.S. 1153 (1995).

E.D. Pa. 2005). However, if no evidence is presented of such a market rate, the "prime-plus" formula should be used.

In this dispute, there was no persuasive evidence of market rate presented, and the creditor bears the burden of persuasion on that issue. See Till v. SCS Credit Corp., 541 U.S. at 479; In re Prussia Associates, 322 B.R. at 591.[22] LTI suggests that the CoBank contract rate is applicable post-effective date. Granted, "[t]he interest rate under an original loan agreement is informative as to a proposed cramdown interest rate's merits to the extent that the original rate was set near in time to a debtor's chapter 11 proceeding and in a period in which market conditions were substantially similar to present conditions." In re Cellular Information Systems, Inc., 171 B.R. 926, 938 (Bankr. S.D.N.Y. 1994); see 6 Norton Bankr. Law & Practice 3d, § 113:15 (2010). However, in this case the CoBank loan agreements with the debtors were entered into in October 2000, almost ten years ago, and SCCCC, LP earnings then were but a small fraction of the current revenues. Thus, the CoBank contract rate of interest is not informative to an appropriate market rate.

Given the plan requirement to sell SCCCC, LP within one year, and the alternative requirement to exercise the "put provision" to SCCTC within four months, and taking into account the current revenues of SCCCC, LP, its cash reserves and the presence of U.S. Cellular as the parent of SCCTC, I find that a 2.75% risk premium over

---

[22]LTI offered the testimony of Mr. King in an attempt to prove that the market rate would be at least 10%. 3 N.T., at 45-47. Mr. King reached his conclusion by assuming that a hypothetical lender would establish an interest rate based upon the absence of any distributions to the debtors from SCCCC, LP, as no distributions had been made from the partnership to its partners for a number of years. 3 N.T., at 57-58. Given the terms of the proposed plan, however, such an assumption is inappropriate. Moreover, Mr. King did not take the SCCTC "put" provision into account.

prime rate of interest constitutes present value of LTI's secured claim.  Thus,

confirmation will not be denied based upon the post-effective date interest rate.[23]

VIII.

LTI also complains that confirmation should be denied under section

1129(a)(10) and (b)(1) because the class of general unsecured claims was "artificially

impaired."  LTI emphasizes that of the three unsecured creditors voting in favor of this

proposed plan two creditors—SCCCC, LP and SCTC—are insiders whose claims are not

counted for purposes of section 1129(a)(10).[24]  In other words, the only impaired class of

creditors that has voted in favor of confirmation is class 2.  And the only vote that counts

under section 1129(a)(10) comes from Bauknight, the sole non-insider, whose claims

against the debtors total only about $3,100.

LTI argues that it is unfair and inequitable and/or violative of section

1129(a)(10) that the debtors' joint plan could be confirmed over its opposition because

the debtors purposely declined to pay a prepetition claim totaling $3,100 on the effective

date of the plan.

"'Artificial' impairment occurs when a plan imposes an insignificant or de

minimis impairment on a class of claims to qualify those claims as impaired under §

1124."  In re Combustion Engineering, Inc., 391 F.3d 190, 243 (3d Cir. 2004).  Moreover,

---

[23]Indeed, the 6% interest rate is consistent with that paid to SCTC, whose right to a plan distribution is subordinate to that of LTI.

[24]The debtors do not dispute that SCCCC, LP and SCTC are considered "insiders" within the definition of section 101(31).

"[t]he policy behind §1129(a)(10) was to assure that a cramdown plan had some indicia of creditor support to justify the involuntary confirmation of the plan over the objection of dissenting creditors."  Carragher, Artificial Impairment Revisited, 24 Amer. Bankr. Inst. J. 26 (Feb. 2005).[25]

The propriety of a chapter 11 plan that "artificially impairs" a class of creditors solely to meet the requirement of section 1129(a)(10) has divided courts and commentators.  See Carragher, Artificial Impairment Revisited, 24 Amer. Bankr. Inst. J. 26 (Feb. 2005).  The Third Circuit has not addressed the issue other than in the context of a mass-tort chapter 11 case.  In re Combustion Engineering, Inc., 391 F.3d 190, 243 (3d Cir. 2004):

> While there is nothing in either §§ 1129(a)(10) or 1124 expressly prohibiting a debtor from "artificially impairing" the claims of creditors courts have found this practice troubling.

---

[25]Whether the policy imbedded in section 1129(a)(10) is justified has been challenged:

> There is no logical basis to make the validity of a cram down on one class turn on whether some other class, any other class, consents by the requisite majorities to accept some other treatment on their distinct claims.  No justifiable policy is served by requiring a plan proponent to jump through this hoop.  The practice of satisfying the one-consenting-class rule by counting the consent of a class whose legally dissimilar rights are only marginally affected makes the requirement a sham in any case.  The one-consenting-class rule has out-lived any useful purpose it ever might have served and, as one of us has previously noted, should be repealed.

Bussell and Klee, Recalibrating Consent in Bankruptcy, 83 Am. Bankr. L.J. 663, 725 (Fall 2009) (footnote omitted).

In other words, while LTI asserts that the favorable vote of a $3,100 unsecured claimant should not permit the cramdown of its $13.5 million claim, critics of section 1129(a)(10) would respond that if LTI's secured claim is otherwise treated fairly and equitably under the plan it has no valid complaint.

In the context of this asbestos-related bankruptcy, so do we.
Unlike the ordinary commercial bankruptcy, where stub
claims may be used to facilitate a workout plan in the overall
best interests of creditors, the use of stub claims in this case
may constitute "artificial impairment" under § 1129(a)(10).

The debtors respond that "artificial impairment" of claims is permitted,

citing In re Duval Manor Assocs., 191 B.R. 622, 628 (Bankr. E.D. Pa. 1996) ("artificial

impairment, while perhaps not philosophically the better view, is nevertheless clearly

permitted under the plain meaning of the statute"). See, e.g., In re Hotel Associates of

Tucson, 165 B.R. 470, 475 (B.A.P. 9th Cir.1994); but see, e.g., In re Windsor on the

River Associates, Ltd., 7 F.3d 127, 132 (8th Cir. 1993) ("[W]e hold that, for purposes of

11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question

arises solely from the debtor's exercise of discretion."); In re River Village Associates,

1993 WL 243897, at *4 (Bankr. E.D. Pa. 1993) ("[A]llowing a purely 'artificial

impairment" of a class would violate the spirit of John Hancock Mut. Life Ins. Co. v.

Route 37 Business Park Associates, 987 F.2d 154, 158-62 (3d Cir. 1993), if not the plain

language of the Bankruptcy Code.").[26]

Before addressing this issue, I note that the debtors also challenge LTI's

premise: that the debtors exercised improper discretion in proposing a plan that failed to

---

[26]In its John Hancock decision, the Third Circuit disapproved of a chapter 11 plan
that "gerrymandered" claims: i.e., "the Code was not meant to allow a debtor complete freedom
to place substantially similar claims in separate classes." Here, there is no challenge to the
debtors' classification of claims.

pay Bauknight's unsecured claim in full on the effective date of the plan.[27]  For the

following reasons, I agree that the concerns posed by "artificial impairment" do not arise

in this contested matter, and therefore I need not decide whether a plan that has artificially

impaired a class cannot rely upon that class vote to meet the requirement of section

1129(a)(10).

The debtors' joint plan proposes to pay unsecured creditors in class 2 in full

from the proceeds of sale after LTI's class 1 allowed secured claim has been paid in full.

As the debtors suggest, LTI's assertion of artificial impairment—that the debtors'

proposed plan could have provided for full payment of Bauknight's claim on the plan

effective date—does not consider the requirements of section 1123(a)(4): a chapter 11

plan must "provide the same treatment for each claim or interest of a particular class,

unless the holder of a particular claim or interest agrees to a less favorable treatment of

such particular claim or interest[.]"  Therefore, a plan provision proposing to pay

---

[27]The debtors also argue that even if Bauknight's claim were paid in full on the
effective date that claim would still be impaired within the meaning of section 1124.  In so
contending, the debtors rely upon In re Atlanta-Stewart Partners, 193 B.R. 79 (Bankr. N.D. Ga.
1996), which held that the 1994 amendment by which Congress deleted section 1124(a)(3) of the
Bankruptcy Code compelled that result.  The debtors' position overlooks that the Third Circuit
has rejected the reasoning of Atlanta-Stewart Partners, which rejection is binding upon this court.
See In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 206-07 (3d Cir. 2003).  Thus, under section
1124, a class of unsecured creditors that is paid in full, and with postpetition interest when the
debtor is solvent, on the effective date is unimpaired.
The debtors further contend that LTI has taken the position that it holds a security
interest in all cash held by the debtors.  If so, and as the debtors have not obtained court approval
to use cash collateral under section 363(e), then they would have no right to pay unsecured
creditors before LTI's secured claim is paid in full.  This argument is unpersuasive, as LTI
almost certainly would give its consent to use of cash collateral so that Bauknight's class 2 claim
would not be impaired.
Conversely, I have insufficient evidence to determine whether, as Ms. Copp
testified, that the debtors have no right to liquidate their interests in the CoBank certificates.  2
N.T. at 101.

Bauknight's unsecured claim in full on the effective date would also have to propose to

pay the allowed unsecured claims of SCCCC, LP and SCTC in full, whose claims total

about $473,000.  LTI does not contend, and there was no evidence presented, that these

insider claims are not valid and legitimate prepetition unsecured claims.  See 2 N.T., at

29-31 (describing the prepetition claim held by SCCCC, LP).

Congress did not exclude insider-held claims from equality of treatment

under section 1123(a)(4).  Moreover, section 1129(a)(10) implicitly recognizes that

insider claims may be properly classified along with non-insider claims.  As a result,

while a debtor may in some instances properly elect to classify insider claims separately,

see In re Carelinc National Corp. 1995 WL 750160 (Bankr. E.D. Pa. 1995), a debtor is

not required to separately classify general unsecured claims held by insiders.  See In re

Heritage Organization, L.L.C., 375 B.R. 230, 301 n. 90 (Bankr. N.D. Tex. 2007); In re

Frascella Enterprises, Inc., 360 B.R. 435, 443 (Bankr. E.D. Pa. 2007) ("There is no per se

requirement that unsecured insider claims be separately classified from other unsecured

claims.  Insider status alone does not make a claim dissimilar."); see also In re Austin

Ocala Ltd., 152 B.R. 773, 776 (Bankr. M.D. Fla. 1993) ("The Debtor's Plan proposed to

separately classify NationsBank's unsecured deficiency claim, Essex's unsecured claim,

non-insider unsecured claims, and insider unsecured claims.  The Debtor failed to offer a

sufficient justification for the separate classification of these claims, all of which are

nothing more than general unsecured claims.").  Compare In re Machne Menachem, Inc.,

233 Fed. Appx. 119 (3d Cir. 2007) (non-precedential) (debtor acted in bad faith when an

insider purchased postpetition certain non-insider unsecured claims, and then separately

classified those claims as insider claims).

60

Thus, the provisions of section 1123(a)(4) apply to all classes of claims, even those classes that include insider and non-insider claims. See generally In re United Marine, Inc., 197 B.R. 942, 946 (Bankr. S.D. Fla. 1996) (although insider claims are not considered for purposes of section 1129(a)(10), they are considered for purposes of section 1126(c)—viz., whether a class of claims has approved a plan—because Congress did not expressly state they are to be excluded).

Clearly, the evidence presented reveals that the debtors have insufficient assets—separate from the value of their partnership interests—to repay all three unsecured claims in full on the effective date. The evidence does reflect, though, that SCCCC, LP has cash reserves exceeding $8 million. It has also loaned funds to the debtors previously. The debtors argue, however, that the limited partnership agreement, ex. D-2, prohibits any current partnership distributions because of the CoBank loan default, ¶ 6.1(b) and because the distributions "in the absolute judgment and discretion of the General Partner . . . [would] jeopardize or limit the business of the Partnership." Ex. D-2, ¶ 6.1(c). In the opinion of the general partner, SCCI, a distribution that would defeat the debtors' joint plan, and so result in LTI's assumption of control of SCCCC, LP, would be detrimental to the partnership.

Whether or not the debtors' interpretation of the limited partnership agreement as precluding distributions is accurate, the evidence clearly reflects that there have been no distributions from the partnership to any of the limited partners for a number of years. Thus, the failure of SCCCC, LP to make any recent prepetition or postpetition distributions to its limited partners was not done so as to confirm a chapter 11 plan. Moreover, even if the partnership had the present right to make distributions to its

61

limited partners, including the debtors, compliance with sections 1129(a)(10) and

1129(b)(1)—i.e., the policy concerns implicated by "artificial impairment"—does not

require or compel a non-debtor insider, which is a legitimate, separate business entity, to

make distributions to a chapter 11 debtor, or make loans to that debtor, or even agree to

less favorable treatment of its claim, in order to allow that debtor to treat an entire class,

or just a non-insider claim, as unimpaired.  Nor do these chapter 11 confirmation sections

require or compel the debtors to seek capital contributions from their members so as to

raise funds to repay the class 2 creditors in full on the effective date.

Accordingly, the debtors' jointly proposed plan meets the requirements of

section 1129(a)(10), and in so doing does not violate section 1129(a)(3) or (b)(2).[28]


IX.


Various miscellaneous issues raised by LTI remain for consideration.

First, LTI argues that the debtors' proposed plan is not fair and equitable

because the risks of non-performance are largely borne by it.  To a large extent, I have

---

[28]A hearing was held to estimate Bauknight's prepetition claims after LTI
challenged their validity just prior to the confirmation hearings in these cases.  By order dated
December 7, 2009, those claims were estimated in the amounts sought by the creditor (and thus I
did not address whether a creditor in a chapter 11 case has standing to object.  Compare In re
Dow Corning Corp., 244 B.R. 721, 751 (Bankr. E.D. Mich. 1999), reversed on other grounds,
255 B.R. 445 (E.D. Mich. 2000); with  In re Micro-Precision Technologies, Inc., 303 B.R. 238,
243 (Bankr. D.N.H. 2003)).  In so doing, I accepted the explanation from Ms. Copp and a
Bauknight partner that accounting services were indeed provided to the debtors prepetition, that
such services were not paid at the time of the debtors' bankruptcy filings, and that such non-
payment was the product of oversight as opposed to a stratagem for confirming a chapter 11 plan.
Rather than repeat the evidence presented at that estimation hearing, the testimony
has been incorporated into this confirmation hearing.

considered that objection in discussing feasibility as well as LTI's challenge to the post-effective date interest rate and, for the reasons stated therein, find this assertion unpersuasive. That is, while there is some risk, that risk is not large enough (and certainly not limited to LTI) to find that the debtors' plan proposal treats LTI's secured claim unfairly and inequitably.

The joint plan, if confirmed, will require the debtor's general partner to seek a purchaser for the limited partnership promptly (unless LTI appeals). If no buyer is found that is acceptable to the debtors within four months of the effective date, the plan requires that the debtors' partnership interests be sold to SCCTC, with that process completed within eight months. And while there is a dispute regarding the anticipated purchase price, the time-frame for completing the sale is consistent with expert opinion (and even with LTI's own proposal for liquidating the debtors' partnership interests); furthermore, LTI concedes that the purchase price obtained by a prompt sale would be sufficient to repay its allowed secured claim in full.

Second, LTI asserts that Ms. Copp would remain as manager of both debtors and of SCCCC, LP as well as chairman of SCTC. See 1 N.T, at 76, 90. She and some family members are substantial equity holders of the debtors and SCTC. LTI views these multiple positions as in conflict, and such conflict is not fair and equitable to the debtors' creditors and equity holders. LTI's Memorandum, at 36-37.[29]

The evidence reveals that Ms. Copp has been in these multiple positions for many years, without complaint from the limited partners of SCCCC, LP or from the

---

[29]LTI does not contend that the debtors have not made the disclosures required by section 1129(a)(5).

equity members of the debtors or other shareholders of SCTC.  Moreover, while Ms.

Copp has acted in such capacities, the value of the limited partnership has increased, to

the benefit of all limited partners.  In addition, LTI identifies no specific conduct that Ms.

Copp would be required to take under a confirmed plan that would be conflicting.

Clearly, it would be in the interests of all creditors and equity members for Ms. Copp to

obtain the highest price possible for either the limited partnership or the debtors' interests

therein.  And her responsibilities in connection with such a sale are the only significant

difference from her prepetition duties.  Therefore, this contention is not persuasive.

LTI also complains that SCCCC, LP has paid for certain postpetition

professional expenses of these debtors without receiving court approval either for

engagement of those professionals or the payment of their expenses, in violation of

section 1129(a)(4).

For example, separate from the treatment of Bauknight's claim under the

proposed plan, LTI notes that, although never engaged under section 327 to provide

postpetition professional services to these debtors, Bauknight has done so without

compensation.  (SCCCC, LP had paid for some of those services but recouped those

funds from Bauknight.  1 N.T. at 62-64.)  The limited partnership also paid for a

postpetition appraisal done by BIA/Kelsey of the limited partnership as well as for an

individual engaged by the limited partnership to aid in seeking refinancing.[30]

> Section 1129(a)(4) of the Bankruptcy Code requires that
> certain professional fees and expenses paid by the plan
> proponent, by the debtor, or by a person issuing securities or
> acquiring property under the plan, be subject to approval of

---

[30]Ms. Copp testified that such payments were made because the interests of the
limited partnership were implicated by the services rendered.  2 N.T. at 33-37.

> the court as reasonable.  Section 1129(a)(4) of the Bankruptcy
> Code has been construed to require that all payments of
> professional fees made from estate assets be subject to review
> and approval by the Bankruptcy Court as to their
> reasonableness.

In re Idearc Inc., 2009 WL 5205346, at *20 (Bankr. N.D. Tex. 2009); see Matter of Cajun
Elec. Power Co-op., Inc., 150 F.3d 503, 514-15 (5th Cir. 1998).

Confirmation can be denied when a proposed chapter 11 plan does not
provide for court review of professional fees to be paid by the debtors, a plan proponent
or "a person issuing securities or acquiring property under the plan," thus insuring the
reasonableness of those payments.  See, e.g., In re Congoleum Corp., 414 B.R. 44, 59
(D.N.J. 2009).  Where a plan provides for court review of professional fees to be paid by
the plan proponent for services rendered prior to the effective date of the plan, then the
requirements of section 1129(a)(4) are met.  See In re Burns and Roe Enterprises, Inc.,
2009 WL 438694, at *28 (D.N.J. 2009).

Here, the payments made by SCCCC, LP of which LTI complains are
payments made by an entity that is outside the scope of section 1129(a)(4).  See In re
Cajun Elec. Power Co-op., Inc., 150 F.3d at 514 (section 1124(a)(4) has been enforced as
written); see also In re River Village Assocs., 161 B.R. 127, 141 (Bankr. E.D. Pa. 1993)
(declining to apply section 1124(a)(4) to a plan proponent's professional fees when such
payments are not from estate property), aff'd, 181 B.R. 795 (E.D. Pa. 1995). Those
counsel fees to be paid by the debtors for services rendered are subject to court approval
in paragraph 3.1 of the proposed plan.  Therefore, this objection to confirmation is
unpersuasive.

Next, LTI summarily argues that, by including the debtors' managers, professionals and agents, the exculpation provision in the proposed joint plan, found in paragraph 12.2, violates 11 U.S.C. § 524(e) of the Bankruptcy Code, which restricts bankruptcy discharges to debtors.  LTI Memorandum, at 39.  Similar exculpation provisions have been included in confirmed plans to the extent that such provisions are limited to postpetition activities, see, e.g., Murphy v. Weathers, 2008 WL 4426080, at *5-*6 (M.D. Ga. 2008); In re Granite Broadcasting Corp., 369 B.R. 120, 139-40 (Bankr. S.D.N.Y. 2007), appeal dismissed, 385 B.R. 41 (S.D.N.Y. 2008), including decisions within this circuit, such as In re PWS Holding Corp., 228 F.3d 224, 245-47 (3d Cir. 2000) (noting that such plan provisions were becoming "commonplace"); In re Coram Healthcare Corp., 315 B.R. 321, 337 (Bankr. D. Del. 2004); Western Mining & Investments, LLC. v. Bankers Trust Co., 2003 WL 503403, at *3 (D. Del. 2003); see also In re eToys, Inc., 331 B.R. 176, 187 (Bankr. D. Del. 2005).

The confirmation order will make clear that the exculpation provisions apply only to postpetition conduct.

Finally, LTI objects to the inclusion of the injunction in favor of the debtors found in paragraph 10.6 of the proposed plan.  The debtors' creditors are enjoined from any collection actions for a period of 18 months or a default by the debtors of their confirmed plan.  In addition, paragraph 10.8 of the joint plan states that the plan is not intended to waive a discharge.

By virtue of 11 U.S.C. § 1141(a), the provisions of a confirmed plan bind the debtors and its creditors, except as provided in section 1141(d)(3).  Section 1141(d)(3) states:

(3) The confirmation of a plan does not discharge a debtor if--

> (A) the plan provides for the liquidation of all or
> substantially all of the property of the estate;

> (B) the debtor does not engage in business after
> consummation of the plan; and

> (C) the debtor would be denied a discharge
> under section 727(a) of this title if the case were
> a case under chapter 7 of this title.

As the debtors are not individuals, section 727(a)(1) would preclude the

entry of a bankruptcy discharge were these cases proceeding under chapter 7. See, e.g.,

In re Mahoney Hawkes, LLP, 289 B.R. 285, 303 (Bankr. D. Mass. 2002). Their jointly

proposed plan may provide for the liquidation of the debtors' partnership interests, which

are substantially all of their assets, unless LTI's allowed secured claim is $3,500,000 or

less. Moreover, upon the sale of those interests, which sale would consummate their plan,

the debtors would not be engaging in their prepetition business, which was to act as

general and limited partners of SCCCC, LP. See In re Grausz, 63 Fed. Appx. 647 (4th

Cir. 2003):

> Indeed, the Joint Plan of Liquidation clearly did not permit the
> continuation of any of Dr. Grausz's pre-petition businesses,
> instead it provided for liquidation of those businesses. It
> seems clear to us that § 1143(a)(3)(B) does not refer to basic
> employment by an individual debtor but to the continuation of
> a pre-petition business. . . .

Id., at 650.

Accordingly, if either SCCCC, LP or the debtors' partnership interests are

sold under the confirmed plan, the debtors are not entitled to receive a bankruptcy

discharge. See generally Teamsters Pension Trust Fund of Philadelphia and Vicinity v.

Malone Realty Co., 82 B.R. 346, 349 (E.D. Pa. 1988) ("[A] corporate or partnership

67

debtor that is both liquidating and discontinuing its business does not receive a discharge when its plan is confirmed."); In re Mahoney Hawkes, LLP, 289 B.R. at 303-04; In re Wood Family Interests, Ltd., 135 B.R. 407, 410 (Bankr. D. Colo. 1989) (limited partnership cannot receive a discharge upon confirmation of a liquidating plan).  Given that I was to accept, for purposes of confirmation, the LTI's secured claim far exceeds $3.5 million, in these circumstances, the provisions of paragraphs 10.6, 10.8 of the plan are invalid.

As paragraph 12.5 proposes that such invalid provisions may be stricken, and as LTI objects to their inclusion, the confirmation order will so direct.  As a result, creditors such as LTI may proceed against the debtors after confirmation so long as their actions do not undermine the terms of the confirmed plan.[31]

X.

In sum, although a few plan provisions are inappropriate or unclear, those defects can be corrected consistent with the plan itself.  See generally In re Lapworth 1998 WL 767456, at *3 (Bankr. E.D. Pa. 1998) ("not every violation of the Code should compel denial of confirmation").  The end result—that the debtors will liquidate their partnership interests within 12 months and repay all allowed claims in full, with interest, with any residue distributed to equity holders—is feasible, consistent with the testimony

---

[31]For example, LTI's execution upon the debtors' CoBank participation certificates would not be barred by the debtors' confirmed plan.

68

of two expert witnesses, and purported to be desired by the debtors and by LTI, and is fair and equitable to that secured creditor.

An appropriate order shall be entered confirming the debtors' joint second amended chapter 11 plan.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: March 25, 2010.