UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| SOUTH CANAAN CELLULAR INVESTMENTS, LLC, and | : | |
| | : | |
| SOUTH CANAAN CELLULAR EQUITY, LLC | : | Bankruptcy No. 09-10473bf |
| Debtors | : | (Jointly Administered with 09-10474) |

..................................................

MEMORANDUM

..................................................

The above-captioned chapter 11 debtors have filed a joint post-confirmation motion seeking the following relief from this court: the appointment of an appraiser who would value a limited partnership in which the debtors hold interests; and the establishment of an information gathering process by which this court appointed appraiser would value the limited partnership. The debtors' motion was opposed by USCIC of Pennsylvania 5, Inc.,[1] which also holds an interest in the limited partnership in question. The objector contends that this court has no power to grant the relief requested and that the parties' dispute over these two issues must be resolved via arbitration.

A hearing was held on the debtors' joint motion, at which time secured creditor Lackawaxen Telecom, Inc. ("LTI") orally supported SCCTC's opposition to this motion. During the hearing, the debtors and SCCTC revealed that a portion of their dispute had become moot. Moreover, at the conclusion of the hearing, the debtors

---

[1]This entity was formerly known as South Canaan Cellular Telephone Co. (Delaware), or "SCCTC." The parties' memoranda refer to the objector as SCCTC, as will I.

significantly reduced the relief that they are seeking.  Nonetheless, SCCTC and LTI remain opposed to the grant of any relief.

I.

After a hearing and review of the parties memoranda, I find that the relevant facts in this contested matter are not in dispute.

On January 25, 2009, the debtors filed voluntary petitions in bankruptcy under chapter 11.  At the time these two cases commenced, and at the present time, the debtors held interests in the limited partnership known as South Canaan Cellular Communications Company, L.P., d/b/a Cellular One of Northeast Pennsylvania ("SCCCC, LP"), a limited partnership that provides wireless communications services in Pennsylvania Rural Service Area 5 located in Pike and Wayne Counties, Pennsylvania. SCCCC, LP holds a cellular B-side FCC license.

SCCCC, LP has four limited partners: South Canaan Telephone Co. ("SCTC") holds a 10.2% limited partnership interest; South Canaan Cellular Telephone Co., DE ("SCCTC"), a wholly-owned subsidiary of US Cellular, which is in turn a subsidiary of TDS Telecommunications Corp., holds a 49% limited partnership interest; debtor South Canaan Cellular Equity, LLC ("SCCE") holds a 39.8% limited partnership interest; and finally debtor South Canaan Cellular Investments, LLC ("SCCI") is the general partner of SCCCC, LP and holds a 1% limited partnership interest.

By the terms of paragraph 8.1 of the debtors' jointly proposed second amended chapter 11 plan, dated September 28, 2009 and confirmed under 11 U.S.C. §

2

1129(b) on March 5, 2010, with an effective date of May 7, 2010, the debtors assumed a limited partnership agreement with SCCTC and SCTC regarding SCCCC, LP. SCCTC had notice of the terms of the proposed plan, including the assumption of the limited partnership agreement, and had no objections thereto.

In accordance with paragraph 9.1 of the confirmed plan, funding for the plan requires the sale of either SCCCC, LP or the debtors' interests in the limited partnership, which sale is to occur within one year from the effective date of the plan. In relevant part, the confirmed proposed joint plan stated:

> Debtors shall fund payments to be made under the Joint Plan by distributions from the LP to SCTC and the Debtors of net income of the LP, pursuant to the terms of the Partnership Agreement and/or from proceeds from the sale of the LP or sale of the Debtors' interests to South Canaan Cellular Telephone Company pursuant to the Partnership Agreement. The LP will be put on the market by SCCI on or before the Effective Date and such sale shall close within twelve (12) months of the Effective Date. If, four (4) months following the Effective Date, no buyer for the LP is procured or no offer submitted that is acceptable to Debtors, Debtors shall exercise their rights under Section 8.5 of the Partnership Agreement attached hereto as Exhibit "C" and sell their partnership interests to South Canaan Cellular Telephone Company whereupon the Joint Plan shall be funded from the proceeds of the sale of the partnership interests.

Debtors' Confirmed Joint Second Amended Plan, ¶ 9.1,

The citation in paragraph 9.1 of confirmed plan to section 8.5 of the assumed limited partnership agreement refers to a provision in that agreement by which SCCTC has the right to purchase the interests of the other three limited partners (the "call" provision) as well as the right of the three limited partners to compel SCCTC to purchase their limited partnership interests (the "put" provision). As the language of section 8.5 is central to the instant contested matter, I quote it in full:

§ 8.5 At any time after October 1, 2005, SCCTC, its successors and assigns shall have the right to purchase, and the General Partner and the other Limited Partners shall have the right to sell to SCCTC, its successors and assigns, all of the Partnership Interests in the Partnership of the General Partner and other Limited Partners, at a purchase price to be determined in the following manner:

(a) Within 30 days of delivery of written notice to the General Partner and the other Limited Partners of SCCTC's exercise of its option to purchase the General Partner and the other Limited Partners' Partnership Interests pursuant to this section or to SCCTC of the General Partner and other Limited Partners' exercise of their option to sell their Partnership Interests pursuant to this section, SCCTC and the General Partners shall determine the value of the subject Partnership Interests and shall disclose the same in writing to the other at an agreed upon time and place. If the values so determined do not differ from each another [sic] by more than ten percent (10%) of the larger of the two values, then these values shall be added together, divided by two, and the quotient thereof shall be [the] sale or purchase price of the General Partner and the other Limited Partners' Partnership Interests. If the difference between the greater and lesser of the values determined by SCCTC and the General Partners is more than ten percent (10%) of the larger of the two values, then the value of the General Partner and the other Limited Partners' Partnership Interests, which shall be the sale or purchase price thereof, shall be determined by appraisal.

(b) If appraisal is required by the terms of Section 8.5(a) above, it shall be conducted in the following manner:

> (i) The General Partner and the other Limited Partners, acting in concert, and SCCTC shall jointly appoint an appraiser within fourteen (14) days after the delivery of disclosure by both parties as provided in Section 8.5(a) above. Within sixty (60) days of such appointment, said appraiser shall determine the fair market value of the General Partner and the other Limited Partners' Partnership Interests. In determining such value, the appraiser shall determine the going concern value of the entire Partnership. The appraisal value of each of the General Partner and the other Limited Partners'

Partnership Interest shall be equal to the value of the entire Partnership, minus any liabilities of the Partnership, multiplied by the Percentage Interest represented by each of the General Partner and other Limited Partners's Partnership Interest. The value of the General Partner and other Limited Partners' Partnership Interests shall be the value determined pursuant to Section 8.5(a) above which is nearest in amount to the appraisal value determined by the appraiser. In the event that the General Partner and other Limited Partners and SCCTC cannot agree upon an appraiser, the general Partner and other Limited Partners, acting in concert, and SCCTC shall each appoint an appraiser. Within twenty (20) days after appointment, the two appraisers shall select a third appraiser. The value of each Interest shall be determined by the third appraiser, within sixty (60) days of the third appraiser's appointment.

(ii) The decision of the appraiser shall be in writing and shall be dated. Copies of the decision shall immediately be delivered to the General Partner and other Limited Partners and SCCTC at the same time.

(iii) The General Partner and other Limited Partners, acting in concert, and SCCTC shall each pay one half (½) of the fees and expenses of the appraiser appointed hereunder.

(iv) The General Partner shall make available to such appraiser all of the Partnership's books and records and shall give the appraiser full and free access during regular business hours to any and all of the Partnership's property.

( c) Payment of the sale or purchase price determined in accordance with this section and the time of closing for such sale or purchase, shall be the same, *mutatis mutandis*, as set forth in Section 8.1(a) above with respect to the purchase of a Partnership Interest pursuant to right of first refusal.

(d) The terms and conditions of this Section 8.5 shall apply to all of the General Partner's Partnership Interest in the

> Partnership, whether or not at the time of exercise of the right
> to buy or the right to sell such interest, as provided hereunder,
> such interest is held by one or more Partners other than the
> General Partner as of the date of this Agreement.

<u>See</u> Restated Partnership Agreement of Pennsylvania RSA 5 General Partnership/Limited Partnership Agreement of South Canaan Cellular Communications Company, L.P. (attached as exhibit C to the debtors' confirmed chapter 11 plan).

The debtors were unable to procure a buyer for SCCCC, LP, nor obtain an offer to purchase that was acceptable to them within the four months following the plan effective date. Thus, they executed the "put" provisions of the partnership agreement.

The parties agree that the debtor general partner, SCCI, and SCCTC, consistent with section 8.5(a), exchanged their valuations of SCCCC, LP, and that those valuations differed by more than 10%. They further concur that SCCI and SCCTC could not agree upon an appraiser to value the limited partnership. Accordingly, SCCI and SCCTC each chose expert appraisers, as required by section 8.5(b)(i) of the partnership agreement.

According to the testimony presented, for almost two months the appraisers chosen by the debtors and SCCTC were unable to agree upon the requisite third appraiser as required by section 8.5(b)(i). After exchanging lists of acceptable choices, the two appraisers interviewed seven candidates. Just prior to the hearing, they agreed upon the third appraiser: Mr. Mark Sherman, who is a licensed certified public accountant. Mr. Sherman was on the list of candidates proposed by the debtors' appraiser, Mr. William Redpath. By virtue of this agreed choice, that portion of the debtors' motion requesting that this court break the parties' stalemate and choose an independent appraiser is now moot.

As set forth in section 8.5(b)(i), this independent appraiser must now value the limited partnership, and within a particular time-frame. All parties interpret the language of section 8.5(b)(i) of the limited partnership agreement as follows: After Mr. Sherman reaches his opinion as to the value of SCCCC, LP, his opinion is compared with the written valuations that had been previously prepared and exchanged by limited partners SCCTC and the debtors under section 8.5(a). The valuation proposed by the limited partner that is closest to the value opined by Mr. Sherman then becomes the agreed upon value of the limited partnership. And once that value is fixed, the amount SCCTC must pay for the debtors' interests (as well as that held by SCTC) can be computed.

In their instant motion, the debtors proposed a "protocol" or methodology by which this independent appraiser would determine the fair market value of the limited partnership. Included in that proposed methodology are demands that "the parties . . . be permitted to provide the [independent] appraiser such information in writing that the party believes relevant [except there should be no disclosure of the competing valuation opinions of the parties] . . . and the other party should be allowed reasonable opportunity to challenge, in writing, the relevance or weight to be assigned [such information]. . . ." Motion, ¶ 49. The debtors also requested that this court prohibit any "ex parte communication with the [independent] appraiser." Id., ¶ 50. All communication with the independent appraiser must be in writing and served on the opposing party, with a comment period allowed. Id. The chief executive of the limited partnership, Ms. Carolyn Copp (who is also the managing member of SCCI) may be orally questioned by the

7

neutral appraiser, but only in the presence of representatives of the debtors, SCTC, and SCCTC. Id., ¶ 51.

At the hearing held on this motion, Mr. Redpath, the debtors' chosen appraiser, testified and acknowledged that various professional organizations had established standards for the valuation of businesses by appraisers or valuation analysts. See ex. S-2 (Standards set forth by the American Institute of Certified Public Accountants, dated June 2007); ex. S-3 (Standards set forth by the American Society of Appraisers, dated 2009). All of these standards contain similar admonitions to the appraiser or valuation analyst regarding objectivity, independence and impartiality in reaching an opinion as to the value of a business. See ex. S-2, ¶¶ 14, 15. Moreover, the appraiser or valuation analyst should use professional judgment, id., ¶ 4, and the appraiser or valuation analyst should obtain all relevant financial and non-financial information. See id., ¶¶ 25-29.

After Mr. Redpath's testimony was offered, the debtors withdrew their request for this court to establish a "protocol" by which the independent appraiser, Mr. Sherman, would obtain the requisite information needed for his valuation opinion, except in one respect. The debtors still request that this court prohibit Mr. Sherman from learning, prior to issuing his valuation opinion, the written valuation proposals exchanged by the disputing limited partners under section 8.5(a) of the partnership agreement. As the debtors, presumably, have no intention of providing this information to Mr. Sherman, the debtors are requesting implicitly that SCCTC be enjoined from doing so.

The debtors' reasons for prohibiting Mr. Sherman from learning of the limited partners' valuation proposals as part of the "put" process were detailed in their motion as follows:

> Debtors believe that disclosure of the numbers submitted on October 13, 2010 by the buyer and sellers in the put process is contrary to the provisions of Section 8.5(b)(i) of the Partnership Agreement, which does not provide that the appraiser selects the party's number which is closest to the fair market value of the LP as the appraiser has determined it, but rather the purchase price is the number closest to such fair market value determined by the appraiser. Thus, the Partnership Agreement appears to contemplate an appraiser who is blind to the numbers put on the table by the parties. Further, the process is already weighted in favor of SCCTC because the appraiser will know that the opportunity for substantial future work will be strengthened by producing as low a number as possible in hopes of favoring SCCTC. SCCTC's affiliates present an opportunity for significant transactional and appraisal work in the future, given the number of wireless and wireline companies in which they invested. Thus, any disclosure that would allow the appraiser to know which party "wins" if he moves his valuation one way or the other by a few tens of thousands of dollars seriously risks tainting the independence of the appraisal process.
>
> SCCTC has suggested on numerous occasions that the appraiser be permitted to review the numbers exchanged by the parties in the initial stage of the put process (i.e. under Section 8.5(a) of the Partnership Agreement). The number submitted by the Debtors and SCTC was based upon a complex balancing of a number of factors, including (i) various appraisals of the LP and valuation estimates based on various methodologies; (ii) the uncertainty about the number that SCCTC would propose, (iii) the risks associated with the "baseball-like" arbitration provisions of Section 8.5(b)(i) of the Partnership Agreement; (iv) analysis of potential cash owed by the members of the Debtors for federal and state income tax liabilities, and (v) the desire to hedge against the risk of an unfavorable result due to the uncertainties of the appraiser retention process.

Motion, ¶¶ 47-48 (footnote omitted).

In support of the debtors' position, Mr. Redpath testified that he would not wish to know the valuation proposals exchanged by the limited partners, were he serving in the capacity of independent appraiser. As Mr. Sherman was not present in court to testify, his preference or intention on this issue is unknown. Nor it is known whether SCCTC seeks to provide the exchanged proposals to Mr. Sherman whether or not the independent appraiser requests them.

Through its counsel, SCCTC contends that section 8.5 of the limited partnership agreement contains no provision for any court to impose the "protocol" provisions sought by the debtors, including the prohibition of the disclosure of the partners' valuation exchange. Instead, SCCTC maintains that, other than section 8.5(b)(iv) requiring the general partner to provide certain financial information about the partnership to the independent appraiser, the limited partnership agreement is silent on the type of information to be obtained by Mr. Sherman. Such silence on the issue recognizes that the independent appraiser is free to exercise his business judgment to obtain and use any information he believes relevant to his engagement.

Moreover, SCCTC argues that if this issue (or any other dispute involving the "put" process") needs to be determined, the sole forum to do so is arbitration. In so contending, SCCTC relies upon the contractual arbitration provision found in section 12.4 of the limited partnership agreement. Section 12.4 states:

> (a) In case any disagreement with respect to this Agreement, which cannot be resolved by negotiation, shall arise between or among any Partners, any disputing Partner or group of Partners may initiate proceedings to submit such disagreement to arbitration by serving written notice of arbitration on the other Partners, which notice shall include appointment of an arbitrator, naming such arbitrator. Within 15 days after the date that such notice is deemed to be given pursuant to this

Agreement, such other Partners to whom notice is given shall similarly appoint an arbitrator by giving like written notice to the initiating Partner or Partners; or, failing to make such appointment, the arbitrator initially appointed shall be empowered to act as the sole arbitrator and to render a binding decision.  In such event, such sole arbitrator shall set a date for hearing and dispute not later than 30 days after the date of his or her appointment, and shall render his or her decision in writing to the disputing Partners not later than 15 days after the last hearing date.

(b) In the event that the disputing Partners duly appoint arbitrators pursuant to subsection (a) above, the two arbitrators so appointed shall, within 15 days after the appointment of the later of them to be appointed, select a third arbitrator who shall act as Chairman of the arbitration panel. Such arbitration panel shall set a time for the hearing of the dispute which shall not be later than 30 days after the date of the appointment of the third arbitrator, and the final decision of the arbitrators shall be rendered in writing to the disputing Partners no later than 15 days after the last hearing date.

(c) In the event that the arbitrators appointed by the disputing Partners are not able within 15 days after the appointment of the later of them to agree on the selection of a third arbitrator, either one of them may request the American Arbitration Association to select a third arbitrator, and the selection of such arbitrator by such association shall be binding.

(d) The place of any arbitrations shall be Washington, D.C. or at such place as agreed by the disputing Partners.

(e) The arbitration shall be conducted in accordance with the rules of the American Arbitration Association then prevailing, and the decision of the arbitrator or arbitrators, as the case may be, shall be final and binding on the disputing Partners, and shall be enforceable in the courts of the United States.

SCCTC argues that the parties' remaining dispute over the information that the independent appraiser can obtain in determining the value of the limited partnership constitutes a "disagreement with respect to the [Partnership] Agreement" that falls within the arbitration provision of section 12.4.  SCCTC did acknowledge at the hearing,

11

however, that it had not initiated any arbitration of the instant dispute—by providing written notice to the debtors, including naming an arbitrator—as directed by section 12.4(a) of the partnership agreement.

I also note that section 12.7 of the limited partnership agreement contains an integration clause:

> This Agreement embodies the entire agreement and understanding among the Partners relating to the subject matter hereof, and supersedes all prior agreements and understandings relating to such subject matter.

Furthermore, section 12.2 provides that "[t]he Agreement and the rights of the Partners shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware."

I am also aware that paragraph 11.1 of the joint confirmed plan states as follows:

> Jurisdiction of Bankruptcy Court. The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Joint Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:
> 
> ***
> 
> (c) To hear and determine any and all adversary proceedings, applications and contested matters and adversary proceedings, including, without limitation, the pending Adversary Proceeding against LTI and Frank M. Coughlin;
> 
> ***
> 
> (f) To issue such orders in aid of execution and consumation of the Joint Plan to the extent authorized by section 1142 of the Bankruptcy Code;
> 
> ***
> 
> (i) To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Joint Plan[.]

II.

There is no dispute among the parties to this contested matter that the limited partnership agreement entered into by the debtors, SCTC and SCCTC in October 2000 was an executory contract properly assumed by the debtors as a provision of their confirmed plan by virtue of 11 U.S.C. §§ 1123(b)(2) and 1129(b).[2] The assumption of an executory contract by a chapter 11 debtor in possession results in the assumption of the contract with all its provisions. See, e.g., In re CellNet Data Systems, Inc., 327 F.3d 242, 249 (3d Cir. 2003) ("This election [to assume] is an all-or-nothing proposition—either the whole contract is assumed or the entire contract is rejected."). That is, the executory contract is assumed cum onere— i.e., with all of its burdens. See N.L.R.B. v. Bildisco and Bildisco, 465 U.S. 513, 531-32 (1984) (citing In re Italian Cook Oil Corp., 190 F.2d 994, 996 (3d Cir. 1951)).

As noted earlier, Delaware law governs the interpretation of this partnership agreement. Generally, under Delaware law, a court cannot add terms to an agreement that is fully integrated, i.e., reflecting the complete agreement of the parties. See T.P. Inc. v. J&D's Pets, Inc., 1999 WL 135243, at *5 (Del. Ch. 1999). In this dispute, the partnership agreement contains an integration clause, which clause creates "a presumption of integration." Addy v. Piedmonte 2009 WL 707641, at *9 (Del. Ch. 2009). Moreover, "in determining whether a contract is fully integrated, the court focuses on whether it is

---

[2]See generally 6 Norton Bankruptcy Law & Practice 3d § 120:2 (2009) ("[A] majority of courts have held that absent some countervailing fact, a partnership agreement is generally going to be an executory contract.").

13

carefully and formally drafted, whether it addresses the questions that would naturally arise out of the subject matter, and whether it expresses the final intentions of the parties." Id., 2009 WL 707641 at *9.

In reviewing the assumed partnership agreement, I note that it contains 21 typewritten pages, with twelve articles and numerous sections, and is accompanied by a two-page typewritten first amendment. As quoted earlier, the portion of Article 8 that sets forth the "put" and "call" rights contains in section 8.5(b)(iv) a provision relating to information that the independent appraiser can obtain. Thus, it does appear that the limited partnership agreement was carefully and formally drafted, addressed issues concerning implementation of the "put" provisions, and expressed the entire intent of the parties to the agreement. That is, under Delaware law it was a fully integrated contract.

I appreciate that Delaware law would permit a court to add terms to such an agreement, if such terms were intended by the parties but omitted by mutual mistake. See Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Co., 769 F. Supp 671 (D. Del. 1991), aff'd, 988 F.2d 414 (3rd Cir. 1993); T.P. Inc. v. J&D's Pets, Inc., 1999 WL 135243, at *5; Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Systems Co., 1997 WL 525873, at *5 (Del. Ch. 1997) ("Contractual terms inadvertently omitted from the contract may be supplied by the Court."); Gracelawn Memorial Park, Inc. v. Eastern Memorial Consultants, Inc., 280 A.2d 745 (Del. Ch. 1971), aff'd, 291 A.2d 276 (Del. 1972). Nonetheless, evidence of such mutual mistake must be "clear, convincing and free from doubt." T.P. Inc. v. J&D's Pets, Inc., 1999 WL 135243, at *5 (quoting Roos v. Roos, 42 Del. Ch. 40, 43 (1964)). No such clear and convincing evidence has been provided by the debtors.

Moreover, if the desired additional contractual provision concerns a matter not anticipated by one or both parties at the time they entered into their agreement, then a court applying Delaware law will not revise the contract. "It is the task of the parties, not of this Court, to refashion the agreement to reflect new developments." Coca-Cola, 769 F. Supp. at 707. In other words, reformation of a contract is designed to reflect the true intention of the parties at the time of the agreement, not to add terms that one of the parties belatedly desires. See, e.g., Jefferson Chemical Co. v. Mobay Chemical Co., 253 A.2d 512, 516 (Del. Ch. 1969).

As noted above, section 8.5 of the limited partnership agreement contains no provision restricting the information that the independent, third appraiser can obtain in determining the value of the limited partnership. Conversely, it does contain a provision obligating the debtor general partner, SCCI, to provide access to financial records of the SCCCC, LP, as well as access to the partnership facilities.

In addition, the arbitration provision of section 12.4 appears to be intended by the limited partners to be their sole dispute resolution mechanism. Its broad language, covering "any disagreement with respect to this Agreement," was designed to address disputes among limited partners, including those arising from the "put" provisions of section 8.5. See Karish v. SI International, Inc., 2002 WL 1402303 (Del. Ch. 2002) (where the LLC agreement called for arbitration of disputes "arising out of or related to" such agreement, Delaware Chancery Court refused to stay arbitration of a disagreement concerning the valuation of membership units). Therefore, Delaware law would leave intact the alternative dispute resolution mechanism found in the limited partnership agreement. See Lawson v. Household Finance Corp., 17 Del. Ch. 343, 354-55 (1930)

15

(contract provision concerning the appointment of appraisers to value stock would be enforced as written, despite complaint that the terms unfairly reduce valuation).

III.

The debtors and SCCTC disagree about the effect of the contractual arbitration provision in resolving this contested matter. SCCTC, relying upon decisions such as In re Mintze, 434 F.3d 222 (3d Cir. 2006), contend that this federal court is bound by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., and must decline to grant the debtors's request relief. The debtors respond that SCCTC has waived its right to demand arbitration by not opposing the assumption of the limited partnership agreement as part of the confirmation process in this bankruptcy court, and by participating (and opposing) in this court the debtors' unsuccessful earlier motion to extend their four-month deadline to find an acceptable third-party purchaser for the limited partnership.

SCCTC is correct that "federal law presumptively favors the enforcement of arbitration agreements." Harris v. Green Tree Financial Corp., 183 F.3d 173, 178 (3d Cir. 1999). Such presumption applies to many disputes in bankruptcy matters. See In re Mintze. The debtors are correct that the right of a party to enforce a contractual arbitration provision can be waived. This court has the power to determine if SCCTC has waived its right to arbitrate. See Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207, 221 (3d Cir. 2007) ("[W]aiver of the right to arbitrate based on litigation conduct remains presumptively an issue for the court to decide. . . .").

Typically a party will be found to have waived the right to arbitrate a dispute "if the party '[s]ubstantially invoke[s] the litigation machinery before asserting its arbitration right.' . . . A party substantially invokes the litigation machinery when, for example, it files a lawsuit on arbitrable claims, engages in extensive discovery, or fails to move to compel arbitration and stay litigation in a timely manner." Lewallen v. Green Tree Servicing, L.L.C., 487 F.3d 1085, 1090 (8th Cir. 2007) (citation and quoted reference omitted); see also PaineWebber Inc. v. Faragalli, 61 F.3d 1063, 1068-69 (3d Cir. 1995). In addition, however, a few courts have found that a party to a bankruptcy dispute has waived its right to demand arbitration based upon the terms of a confirmed chapter 11 plan. See Ernst & Young LLP v. Baker O'Neal Holdings, Inc., 304 F.3d 753 (7th Cir. 2002); In re All American Semiconductor, Inc., 2010 WL 2854153 (Bankr. S.D. Fla. 2010).

In order to resolve this contested matter, I need not resolve the parties' disagreement regarding the effect of the contractual arbitration provision on the power of this court to act, especially as SCCTC has not triggered any arbitration process. If I assume arguendo that I have the power to grant the debtors the limited relief they now seek, I decline to do so.

The independent, third appraiser was chosen from a list recommended by the debtors. Presumably, the debtors believe that Mr. Sherman will be competent, independent, objective and fair in completing his valuation engagement. Certainly, no evidence was offered to the contrary. The fully-integrated limited partnership agreement contains a provision regarding information which the general partner must make available to Mr. Sherman. To the extent the concern now raised by the debtors—that Mr. Sherman

17

may be influenced by knowledge of the limited partners valuation positions—if valid (as opposed to merely hypothetical) would have been equally valid when the "put and call" provisions of section 8.5 were first negotiated in 2000. Had the partners intended to restrict their valuation positions from being revealed, it would have been simple to have included such a restraint in the agreement.

I thus conclude that Delaware state courts would not now add that restraint by an injunction against a limited partner, and there is no basis, even under the terms of the confirmed plan, for this bankruptcy court to now do so.

Accordingly, for these reasons, the motion of the debtors, to the extent not moot, must be denied.

An order consistent with the memorandum will be entered.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: January 6, 2011